UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------x
                                        21-CR-371(BMC)
UNITED STATES OF AMERICA,
                                        United States Courthouse
                                        Brooklyn, New York

        -versus-                        September 20, 2022
                                        9:30 a.m.
THOMAS BARRACK and MATTHEW
GRIMES,

        Defendants.

------------------------------x

        TRANSCRIPT OF CRIMINAL CAUSE FOR JURY SELECTION
            BEFORE THE HONORABLE BRIAN M. COGAN
                UNITED STATES DISTRICT JUDGE


APPEARANCES

For the Government:         UNITED STATES ATTORNEY'S OFFICE
                            Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201
                            BY:  RYAN C. HARRIS, ESQ.
                                 SAMUEL NITZE, ESQ.
                                 CRAIG HEREEN, ESQ.
                                 HIRAL MEHTA, ESQ.
                                 MATTHEW McKENZIE, ESQ.
                            Assistant United States Attorneys


For Defendant Barrack:      WILLKIE FARR & GALLAGHER, LLP
                            787 Seventh Avenue
                            New York, New York 10019
                            BY:  MICHAEL SCHACHTER, ESQ.
                                 RANDALL JACKSON, ESQ.
                                 CASEY DONNELLY, ESQ.
                                 STEVEN BALLEW, ESQ.




            (Continued on next page.)


                    Rivka Teich CSR RPR RMR FCRR
                        Official Court Reporter

1    (APPEARANCES)

2    For Defendant Barrack:    O'MELVENY & MYERS LLP
                               400 South Hope Street
3                              Los Angeles, California 10036
                               BY:  JAMES BOWMAN, ESQ.
4
     For Defendant Grimes:     WINSTON & STRAWN LLP
5                              1901 L Street NW
                               Washington, DC 20036
6                              BY:  ABBE LOWELL, ESQ.
                                    SOPHIA ARGUELLO, ESQ.
7                                   JOHANNA HUDGENS, ESQ.
                                    DAVID KOLANSKY, ESQ.
8

9

10

11   Court Reporter:          Rivka Teich, CSR, RPR, RMR, FCRR
                               Phone:  718-613-2268
12                             Email:  RivkaTeich@gmail.com

13   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1          (In open court.)

2          THE COURTROOM DEPUTY:  All Rise.

3          THE COURT:  Good morning.  Have a seat, please.  We

4     have about five people left from yesterday.  I'm going to

5     address the new group that we have, and then we'll be able to

6     go through all through 35 rather than going back and forth.

7     Everyone understand that?

8          (Prospective jury panel enters.)

9          THE COURT:  Good morning everyone.  I'm Judge Cogan.

10    Thank you for coming.  We appreciate your time in doing this.

11    We know it's a sacrifice for you.

12          I know you filled out questionnaires a couple of

13    weeks ago, that was most helpful and it will expedite this

14    process greatly.  The first thing I want to ask is, is there

15    anything that changed with regard to your ability to attend

16    this trial over the next four or five weeks that is not in

17    your questionnaire.  In other words, since the time that you

18    filled out the questionnaire has anything else happened to you

19    that you need to tell me about that might compromise your

20    ability to be here for that time.  If it has, raise your hand,

21    we'll get you a microphone, and you can tell me about it.

22          Okay, we've got one.  Since we can't get the mic to

23    work, let me have this young lady step forward and I'll talk

24    to her up here.

25          You can stay right there behind the glass.  Tell me,

PROCEEDINGS

1    what is your name and juror number.

2              PROSPECTIVE JUROR:  Menahil Khan, juror 184.

3              THE COURT:  Say it again, please?

4              PROSPECTIVE JUROR:  My name is Menahil Khan, juror

5    number 184.

6              THE COURT:  Tell me what has changed that I need to

7    know since you filled out your questionnaire.

8              PROSPECTIVE JUROR:  So my family bought a house and

9    next week I'm moving from Queens to Suffolk County.

10             THE COURT:  We do have lots of people on this jury

11   that are from Suffolk County, so I'm not sure that's a

12   problem.  But have a seat and we'll talk to you individually

13   about that.  Anything else that has changed?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  Thank you.

16             Anyone else needs to tell me any changes they've

17   had?  That includes, by the way, you were asked not to read

18   anything about this case, if despite your best efforts you did

19   read something about this case, now is the time to tell me

20   that you did.  Any changes like that?

21             Some of you might have put on your questionnaire

22   that you did learn something about this case; what I'm

23   interested in is anything since you filled out the

24   questionnaires up to now.  Nothing else?  Okay.

25             What we're going to do now is take you one at a time

1    in another courtroom.  So please be patient with us.  We'll

2    get through this as quickly as we can.  Your time is precious

3    to us all, we're going to try to use it well.

4              (Following takes place in Courtroom 8C)

5              THE COURT:  This is juror 120, Carolyn Warner.

6              (Prospective juror enters.)

7              THE COURT:  Hello, good morning.  How are you?

8              PROSPECTIVE JUROR:  Just fine.

9              THE COURT:  I want to ask you, is there anything

10   either on or off your questionnaire that would make it

11   difficult to impossible for you to attend this trial over the

12   next four or five weeks?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  I want to follow-up and ask you about

15   some of the answers you gave on the questionnaire.  I couple

16   of things I had questions about.

17             In answer to the question how important is religion

18   in your life, you said very important.  That's good.  I just

19   want to make sure that there is nothing in your religion that

20   would stop you from following my directions on the law.  Can

21   you think of anything that would cause you to not to be able

22   to follow my directions?

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  You've been a witness before in court,

25   in a civil case, right.  And you also have problems with your

1    employer and your landlord in a civil case, right?

2            PROSPECTIVE JUROR:  Yes, sir.

3            THE COURT:  Is there anything about those

4    experiences that has given you a view of the justice system,

5    whether it's good or bad, or works or doesn't work?

6            PROSPECTIVE JUROR:  No, sir.

7            THE COURT:  Nothing?

8            PROSPECTIVE JUROR:  No.

9            THE COURT:  You can put aside all your experience in

10   these litigations that you've had and just judge this case

11   based on what is presented in this courtroom?

12           PROSPECTIVE JUROR:  Yes.

13           THE COURT:  I see you were once a victim of a crime,

14   we don't need to get into the particulars.  I want to ask you

15   the question, did the police respond to this crime?

16           PROSPECTIVE JUROR:  Yes, sir.

17           THE COURT:  Did you get any opinion of the justice

18   system and the way that it works based on the response to your

19   situation?

20           PROSPECTIVE JUROR:  I thought it was pretty good.

21   It was supportive.

22           THE COURT:  Supportive.

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  You've had lots of problems with your

25   landlord and employer, I see, that's too bad.  I see that on

1  one occasion based on false complaint from your landlord and

2  employer, the police handcuffed you and took you to the

3  hospital.

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Why did they take you to the hospital.

6          PROSPECTIVE JUROR:  My -- well, look, I have a

7  really strange background where I was in the military.  And I

8  think my employer saw something wrong with my criminal record.

9  I got printed and I had a classified clearance in there.  I

10 don't think civilians take that type of thing -- they don't

11 see it favorably.  And I think that my employer was probably

12 hostile and maybe I said something, and they just followed up.

13         THE COURT:  I see why they would handcuff you in

14 those kind of confusing circumstances, but why the hospital?

15         PROSPECTIVE JUROR:  I have no idea.

16         THE COURT:  They just took you.

17         PROSPECTIVE JUROR:  Yeah.  They still do it to this

18 day actually.  I have the Veterans Administration hospital the

19 Veterans Administration is a big agency and they work with

20 them.

21         THE COURT:  In terms of your employment you had an

22 oath judge that really denied a complaint against you; is that

23 what happened?

24         PROSPECTIVE JUROR:  Yes.  After I went to the

25 hospital my employer took me to court for the same thing --

1  this is all one situation -- and the judge read, heard,

2  everything and looked at all the records and didn't find

3  anything.

4          THE COURT:  I think your employer is your landlord;

5  is that right?

6          PROSPECTIVE JUROR:  Well, my employer the City of

7  New York, landlord is the YWCA.  So they work hand in hand

8  together in terms of, like, if they have, like, welfare, they

9  have clients that live in the building, get city services,

10  they get SSDI and stuff.

11          THE COURT:  Right.  You mentioned, I think you

12  mentioned, that the City was concerned, or your landlord was

13  concerned, about criminal record.  Do you have a criminal

14  record?

15          PROSPECTIVE JUROR:  No, I had a classified

16  clearance.  I have a stamp on my records.

17          THE COURT:  I see.

18          PROSPECTIVE JUROR:  Because I had been cleared by

19  the FBI while I was in the military to handle classified

20  documents.  And I think that my employer thinks that I am

21  shady or something.

22          THE COURT:  Right.  Which branch did you serve?

23          PROSPECTIVE JUROR:  I served in the regular Army.

24          THE COURT:  What rank were you.

25          PROSPECTIVE JUROR:  A Sergeant.

1          THE COURT:  When was that?

2          PROSPECTIVE JUROR:  That was in 1979 to 1987.

3          THE COURT:  This case is going to involve some

4    issues about classified documents, and because you and

5    clearance and have seen classified documents, that's not a

6    problem, but I want to make sure you can put aside what you

7    know and focus on what you hear in this courtroom.  I can't

8    have you thinking they should have done this or should have

9    done that.  The issue for you is to consider the evidence in

10   this case and only the evidence.  Can you do that?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  I see your late brother did some time

13   for larceny.  Any impression you got from the criminal justice

14   system based on that?

15         PROSPECTIVE JUROR:  Well, no.  I'm neutral.

16         THE COURT:  What the City has been doing is they've

17   been claiming falsely that you have a mental illness and the

18   oath judge rejected that and the Veterans Administration

19   rejected that, right?

20         PROSPECTIVE JUROR:  Yes.  Because I had been

21   examined while I was in the military, because I had that

22   classified clearance I was examined by a big hospital,

23   military hospital.  There is nothing wrong with me.

24         THE COURT:  You have never gotten any diagnosis of

25   some kind of mental impairment.

1    PROSPECTIVE JUROR:  No.  I have no criminal record.

2  And I have no diagnosis of mental impairment.

3    THE COURT:  I take it during the time you served,

4  you were not deployed overseas, were you?

5    PROSPECTIVE JUROR:  No, I wasn't deployed overseas.

6    THE COURT:  Thank you for your service by the way.

7    PROSPECTIVE JUROR:  Thank you.

8    THE COURT:  When you were asked about any

9  information on the United Arab Emirates you said the most that

10  you know is that you heard about the journalist and what

11  happened.  And of course you don't agree that anyone should be

12  dismembered and that's horrible.  That's understandable.

13  There are going to be discussions in the case and evidence

14  pertaining to United Arab Emirates and likely Saudi Arabia.

15  Is there anything about what you know that you wouldn't be

16  able to evaluate the facts here independently putting aside

17  what you might know?

18    PROSPECTIVE JUROR:  I don't know that much about

19  Saudi Arabia.

20    THE COURT:  So what you know is about the UAE?

21    PROSPECTIVE JUROR:  Excuse me?

22    THE COURT:  What you know is about the UAE, the

23  United Arab Emirates?

24    PROSPECTIVE JUROR:  I've read something about that,

25  but the news has not really talked a lot about it.  I know

1    about what the new has said in the past about them.

2            THE COURT:  Can you put aside what you've read in

3    the newspapers and judge this case based on what you hear in

4    the courtroom?

5            PROSPECTIVE JUROR:  Yes.

6            THE COURT:  I didn't understand one of your answers.

7    You were asked if you or one of your family members worked for

8    a company that did business in the Middle East.  You did.  For

9    the explanation you said that you think the U.S. Government

10   works with countries in the Middle East -- oh, let me see if I

11   understand.

12           You're saying that when you were in the Army you

13   were working, in effect, for the Government.  And the

14   Government you know has relations with countries in the Middle

15   East.

16           PROSPECTIVE JUROR:  Yes.  The units that I was in,

17   they had relations back in the 80s, very briefly, probably

18   just slightly, with the people in the Middle East.

19           THE COURT:  What did your work have to do with the

20   Middle East, if anything at all?

21           PROSPECTIVE JUROR:  Well, my unit, from what I know,

22   because I only, I had secret clearance, they dealt with

23   Russia.  I think Russia and the Middle East are kind of like

24   partners a little bit over here, I'm seeing in the news.  I

25   would just assume that they had some type of business

1  relationship back then.

2          THE COURT:  When you say you just had secret

3  clearance, you didn't have top-secret clearance.

4          PROSPECTIVE JUROR:  I had people that I worked for

5  that, you know, wonderful people, they had top secret.

6          THE COURT:  Right.  You mentioned that you get

7  emotional about the 9/11 attack and also that our pull out

8  from the Middle East, you say.  And the people that were left

9  behind provokes empathy and sadness.  Can you elaborate on

10  that?

11          PROSPECTIVE JUROR:  As much as everyone else in this

12  country.  I think if you took a poll, I don't think most

13  people would be really happy about, you know, they may have

14  some opinion about the subject that you're talking about.  I

15  think I'm not really like absolutely upset over it.  But you

16  know, like most voters, you would be concerned about something

17  like that.  That's why I put that there.

18          THE COURT:  Okay.  Do you have any kind of dislike

19  for any of the countries in the Middle East?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Any follow-up from the lawyers?

22          MR. HARRIS:  I have a few, your Honor.

23          Good morning, Ma'am.  You mentioned that you're

24  currently receiving treatment from the Veterans

25  Administration?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  I'm sorry.  Did I miss that?  You said

3   you no longer receive any treatment from the Veterans

4   Administration?

5          PROSPECTIVE JUROR:  I don't have a benefit package.

6   I've never been labeled a disabled veteran.  All veterans have

7   healthcare, everybody that was honorably discharged have

8   healthcare.  I have the healthcare, all veterans have.

9          MR. HARRIS:  I see.  So no current treatment.

10          PROSPECTIVE JUROR:  I have never had treatment for

11   mental illness.

12          THE COURT:  I wasn't talking about mental illness.

13   I thought you were talking, you're going to the Veterans

14   Administration.

15          PROSPECTIVE JUROR:  I have healthcare.

16          THE COURT:  For routine medical you're going to the

17   VA.

18          PROSPECTIVE JUROR:  Yes.

19          MR. HARRIS:  Are you satisfied with the treatment

20   you received?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Why are you smiling?

23          PROSPECTIVE JUROR:  They are fun to be around.

24          MR. HARRIS:  You listed on your most admired person

25   former President Trump.  As may have heard in the

1   questionnaire, the former President's name may come up in this

2   case.  Members of his administration's names may come up in

3   this case.  Certain actions taken by the administration may

4   come up in this case.  I wanted to get your thought, would you

5   be able to assess the evidence in this case given your

6   feelings about the President and put those aside?

7          PROSPECTIVE JUROR:  I would be able to because I

8   know if I -- I look at the evidence, and it's really going in

9   favor of the President, somebody may get hurt, defendants may

10  not get a fair trial.  It's not right, because President Trump

11  can take care of President Trump, and these defendants they

12  are entitled to a fair trial.  They are entitled to people who

13  are going to look impartially at the evidence and make the

14  decision based on what is there in the paperwork.  That's the

15  only -- what is just, that's what I -- if I -- if you give me

16  the opportunity, that's the only thing I can give back to you,

17  give back in return.

18          MR. HARRIS:  Are you concerned they won't receive a

19  fair trial?

20          PROSPECTIVE JUROR:  I don't know.  I know I would,

21  I'm going, if I would be given a seat, if, in the jury, I

22  would be obligated to do it based on my conscious and

23  everything, I would have to give them the benefit of the doubt

24  and look at the evidence as it is.

25          MR. HARRIS:  Would you have any hesitation in voting

1  guilty if the evidence supported it, despite that people in

2  this case have a relationship with the former President?

3       PROSPECTIVE JUROR:  If they are guilty and there is

4  evidence that they are guilty, I'm obligated to vote guilty.

5       MR. HEEREN:  Can I ask a question?

6       THE COURT:  One.

7       MR. HEEREN:  Good morning, ma'am.  You indicated I

8  believe you said of that civilians don't take classified

9  clearances favorably and these issues were ongoing.  Could you

10  elaborate on that a little bit?

11       PROSPECTIVE JUROR:  The problem just keeps coming

12  back up.  The cops come upstairs to my house, the landlord

13  opens the door, they come in.  I always have this problem with

14  them.  What I do is I just call VA.

15       MR. HEEREN:  What is that, what is the relationship

16  to your classified clearance is what I'm trying to understand.

17       PROSPECTIVE JUROR:  That's a good question because

18  people don't realize when you get the clearance you get a

19  stamp on your record, so people they always see that criminal

20  stamp on your record that you were examined by the FBI.

21       MR. HEEREN:  What record are you referring to?

22       PROSPECTIVE JUROR:  Military.  Also the classified

23  documents, some of them can remain on file or 80 years or

24  more.  It's a sticky thing, but I have the Veterans

25  Administration who handles DD214, and stuff and military

1   issues like that, and so they handle it.

2          MR. HEEREN:  How are they learning about this?  How

3   are the police and the landlords learning about your

4   classified clearance and your military record?

5          PROSPECTIVE JUROR:  Well, the police, the city, city

6   police.  And where I work at is the city, I work for the City

7   of New York.  So my employer, he works with children, so they

8   work with the DA.  So with the DA and the children, you know

9   children who are abused, or abandoned, and beaten, children

10  who die, the police are involved with it, with examining

11  children, and you know, any kind of abuse.  They are very

12  concerned about these children.  So they look at everybody's

13  background, everybody's record.  You even have to take

14  fingerprints to get there, to work there for children.  So I

15  know that they saw my criminal background that's stamped with

16  the FBI.  That's how they are.

17         THE COURT:  In other words, what you're saying is

18  that when they did a criminal background check on you, they

19  found the FBI and the fact that your military record was

20  stamped with a classified permission, is that what is going

21  on?

22         PROSPECTIVE JUROR:  Yes.  They have to, when you get

23  a classified clearance they come in office, you got to get

24  fingerprint in the office, and they send it up to the FBI.

25  When they send it up to the FBI, they come back, the FBI comes

1    back with a receipt.  It's stamped on your criminal record

2    that you were examined by the FBI.

3         THE COURT:  I see, okay.

4         PROSPECTIVE JUROR:  Then the employers, when they

5    check your background, they see the stamp there.  That's when

6    there is a problem.

7         There is like a community of people, there is

8    thousands of civilians who have these criminal -- these

9    classified backgrounds.  They worked in this field and so I'm

10   not really that terribly unusual; just so everybody knows.

11        THE COURT:  Okay.  Anything else?

12        Just wait for us in the hall we'll have you

13   accompanied out there and we'll get back to you promptly.

14        PROSPECTIVE JUROR:  Thank you very much.

15        (Prospective juror exits.)

16        THE COURT:  Any challenges?

17        MR. HARRIS:  The Government moves to strike, your

18   Honor.

19        THE COURT:  Why?

20        MR. HARRIS:  This woman presented very well but I

21   have a lot of questions about women's mental health.  And the

22   fact that she's been handcuffed and taken to the hospital,

23   both by her employer and her place of residence.  I question

24   the mental health.  She said the cops keep coming to visit

25   her.  I'm concerned that we're only getting one side of the

1   story here.  Given the fact that we have plenty of jurors in

2   this case, I'm concerned about putting someone on the jury who

3   has mental health challenges in this case when we have plenty

4   of jurors we don't have concerns about.

5           MR. HEEREN:  I would add, the reason I asked about

6   classified clearance, that's not consistent with my

7   understanding of how it works.  I don't think this was a lack

8   of being articulate.  She's very articulate.  It sounds more

9   like a some sort of issue.  The idea that she has a stamp on a

10  criminal record.  She kept saying criminal record, even when

11  we directed her back to military background, and saying that

12  stamp is why police is going to her house.  A story about

13  keeping children safe.  It's concerning, your Honor.

14          MR. JACKSON:  We don't oppose.

15          THE COURT:  Excused for cause.

16          (Prospective juror enters.)

17          THE COURT:  This is juror 125, Theodore Fekula.

18          How are you?

19          PROSPECTIVE JUROR:  I'm okay.  How are you?

20          THE COURT:  Your last name is Fekula.  We had

21  someone with a similar last name yesterday.

22          MR. JACKSON:  I think he spoke briefly, your Honor.

23          THE COURT:  You made a note that you may not get

24  paid for the four or five weeks you're here.  Remind me what

25  you do?

1    PROSPECTIVE JUROR:  A substitute teacher.  I work

2  per diem.  If they need me, they call me in.  If I don't get

3  called in, if I don't come in, I don't get paid.

4    THE COURT:  I see.  How often do you work, normal

5  times?

6    PROSPECTIVE JUROR:  Normal times, like three to four

7  days a week, maybe.

8    THE COURT:  So you would lose up to -- I don't think

9  we're sitting any weeks five days, but you could lose three or

10  four days of pay?

11    PROSPECTIVE JUROR:  Yes.

12    THE COURT:  What would that do to your lifestyle?

13    PROSPECTIVE JUROR:  I wouldn't be able to pay rent

14  for my apartment.

15    THE COURT:  Anything further?

16    MR. HARRIS:  No, your Honor.

17    THE COURT:  Thank you.  Just wait for us in the hall

18  for a minute we'll be right with you.

19    PROSPECTIVE JUROR:  Also, I put it down in the

20  questionnaire I have ADHD.  I'll have trouble paying attention

21  also.

22    THE COURT:  I'll tell you, if everyone who had ADHD

23  had to leave this courtroom, it would probably be empty.  But

24  thank you.

25    (Prospective juror exits.)

1      THE COURT:  Financial hardship.

2      MR. HARRIS:  Motion to strike.

3      THE COURT:  This is Yahniviz Collado, juror 129.

4      (Prospective juror enters.)

5      THE COURT:  How are you?

6      PROSPECTIVE JUROR:  Good.  And you?

7      THE COURT:  The first thing I need to know, is there

8  anything on or off your questionnaire that would make it

9  difficult or impossible for you to be here for the four or

10  five weeks of the trial?

11      PROSPECTIVE JUROR:  No.

12      THE COURT:  Let me follow-up with a couple of

13  questions on the answers you gave on your questionnaire.

14      First, you had a half brother who served sometime

15  for a crime?

16      PROSPECTIVE JUROR:  Five years.

17      THE COURT:  Did you form any views of the criminal

18  justice system as a result of that?

19      PROSPECTIVE JUROR:  No.

20      THE COURT:  You also you said that there is no

21  public person who you most admire or least admire.  Nobody?

22  Not even like a celebrity?

23      PROSPECTIVE JUROR:  Oprah probably.

24      THE COURT:  Is that most or least?

25      PROSPECTIVE JUROR:  Most.

1          THE COURT:  For the record, that was a sarcastic.

2          You follow the news every day?

3          PROSPECTIVE JUROR:  Somewhat.  I kind of cut that a

4     little bit.

5          THE COURT:  Have you ever heard anything about this

6     case at all?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  When you were asked whether others would

9     describe you as having an open mind and willing to listen and

10    assess different viewpoints, you said maybe.

11         PROSPECTIVE JUROR:  Yeah, it depends on the person.

12         THE COURT:  Talk to us about whether family or

13    friends, people you're closest with, would think you have an

14    open mind.

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  If you come into this trial, you would

17    neutrally listen to everything that is presented?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Any preconceptions you have at all about

20    either this case or the fact that a trial is occurring that

21    might make it difficult for you to be neutral?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  One question that you skipped over is

24    you were told the trial may involve individuals and events

25    associated with the 2016 Presidential campaign of former

1  President Trump and the Trump administration.  You were asked

2  if you have any strong feelings about the campaign or the

3  Trump administration that might affect you here.

4         PROSPECTIVE JUROR:  I didn't answer that?

5         THE COURT:  You didn't answer.

6         PROSPECTIVE JUROR:  I don't have strong feelings.

7         THE COURT:  You were asked if you followed the news

8  about former President Trump, and you said somewhat closely,

9  which is the middle answer.  Did you form any impressions as

10  to the President that you would have a difficult time putting

11  aside if you sat on this jury?

12         PROSPECTIVE JUROR:  Not necessarily, no, I don't

13  think --

14         THE COURT:  Not necessarily or no?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  Let's suppose, for example, that

17  President Trump were to take the stand in this case --

18         PROSPECTIVE JUROR:  Okay.

19         THE COURT:  -- and testify.  If he took the stand,

20  would you evaluate his testimony neutrally?  Or would you

21  think, that's the former President I have to believe what he

22  says?  Or, that's the former President, I'm not going to

23  believe what he says.  Would you have either of those

24  reactions?

25         PROSPECTIVE JUROR:  I would believe what he says.

1        THE COURT:  You would.

2        PROSPECTIVE JUROR:  Yes.  He's under oath.

3        THE COURT:  Like any other witness, he would have to

4    under oath.  Would you evaluate him any differently than you

5    would any other witness?

6        PROSPECTIVE JUROR:  No.

7        THE COURT:  You also mentioned that you wouldn't

8    feel safe in most of the Middle East countries.  Can you

9    expand upon that a little bit?

10       PROSPECTIVE JUROR:  I guess whatever that is going

11   on, I've heard comments from co-workers.  It's not the safest

12   to travel in those areas.  I probably wouldn't go there and

13   have a vacation to relax.

14       THE COURT:  Any particular strong feelings you have

15   about countries in the Middle East?

16       PROSPECTIVE JUROR:  No.

17       THE COURT:  There was one question you marked that

18   you didn't understand.  Frankly, I will tell you, it's not the

19   best-worded question in the world.

20       It says:  The Indictment that was filed against the

21   defendants in this case is the means by which the Government

22   gives them notice of the charges against them and brings them

23   before the Court.  The Indictment is an accusation and nothing

24   more.  The Indictment is not evidence.  And the jury must not

25   give it any weight at arriving at its verdict.

1          Let me clarify the question for you.  I agree, it's

2     not a good question.

3          PROSPECTIVE JUROR:  I was confused.

4          THE COURT:  When someone gets indicted in this

5     country it's done through a Grand Jury that hands down a piece

6     of paper that says we hereby indict this person.  It's a

7     charge.  It doesn't mean they are guilty.

8          When you consider the case, you can't consider the

9     Indictment as any evidence at all that the defendants are

10    guilty.

11         PROSPECTIVE JUROR:  Okay.

12         THE COURT:  Do you understand that?

13         PROSPECTIVE JUROR:  Okay.

14         THE COURT:  Do you have any problem with that?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  You wouldn't hold it against the

17    defendants just because they were indicted they must be

18    guilty?

19         PROSPECTIVE JUROR:  I wouldn't, no, not at all.  I

20    wouldn't, not I have to see the proof.

21         THE COURT:  You got a medical condition that looks

22    like you're going to need an MRI.

23         PROSPECTIVE JUROR:  Luckily that's been cleared.

24         THE COURT:  Good, congratulations.

25         Any follow-up?

1    MR. HARRIS:  No, your Honor.

2    MR. JACKSON:  No, your Honor.  Thank you.

3    THE COURT:  Thank you.  Wait for us outside we'll be

4  right with you.

5    (Prospective juror exits.).

6    THE COURT:  No challenges.

7    MR. HARRIS:  No challenges.

8    THE COURT:  This is George Hanley, juror 135.

9    (Prospective juror enters.)

10    THE COURT:  Hello.  How are you?

11    PROSPECTIVE JUROR:  I'm okay.

12    THE COURT:  Mr. Hanley, anything on your

13  questionnaire or off your questionnaire that would cause you a

14  very difficult problem in being a juror in this case for four

15  or five weeks?

16    PROSPECTIVE JUROR:  The amount of time, four weeks,

17  I don't think my employer is going to cover paying me for that

18  amount of time.  I think I'm entitled to three days, and this

19  is the third day now.  There is a financial commitment there.

20  Also, just the commute.  It was pretty rough.

21    THE COURT:  You're coming from Nassau or Suffolk.

22    PROSPECTIVE JUROR:  From Oyster Bay and Nassau.

23    THE COURT:  Remind me who you work for?

24    PROSPECTIVE JUROR:  I work for a company called

25  DioPath (ph), which has a, they are a vendor for Northwell.

1    They are based in Chicago area.

2            THE COURT:  Do you know for sure that DioPath

3    wouldn't pay you beyond three days?

4            PROSPECTIVE JUROR:  I didn't ask.  But I know that

5    they granted me three days when I, in August, when I first --

6    I put three days on my code, when I code my time sheets.

7            THE COURT:  What if I called up your supervisor or

8    the president of DioPath and I said I need this guy for four

9    or five weeks, I would appreciate it if you paid him.

10           PROSPECTIVE JUROR:  They would listen to you I don't

11   know what the outcome would be.

12           THE COURT:  How bad would it be for you if you

13   didn't get paid for four or five weeks?

14           PROSPECTIVE JUROR:  I have only been with DioPath

15   for not even six months.  I was out of work for a year

16   and-a-half, and I'm dealing with some debt and some --

17   struggling to pay, it's check-to-check at this point.  I'm

18   trying to get back on my feet.

19           THE COURT:  Understood.

20           Any follow-up?

21           MR. HARRIS:  No.

22           MR. JACKSON:  No.

23           THE COURT:  Thank you.  Please wait for us out in

24   the hall.

25           (Prospective juror exits.)

1          THE COURT:  Financial hardship.

2          MR. JACKSON:  Yes, your Honor.

3          (Continued on next page.)

1  (Continuing)

2           THE COURT:  This person who we are interlineating

3  now is Zachary Blitstein, number 68.

4           THE LAW CLERK:  141.

5           THE COURT:  Am I wrong?

6           THE LAW CLERK:  Just to switch.

7           THE COURT:  So this is not Mr. Blitstein?

8           THE LAW CLERK:  This is Donald Villatana, 141.

9           THE COURT:  141.

10          Zachary Blitstein, 68,  will be next.

11          THE COURT:  Okay.

12          (Prospective Juror enters.)

13          THE COURT:  Mr. Villatana how are you?

14          THE PROSPECTIVE JUROR:  Good morning everybody.

15          THE COURT:  Have a seat, please.

16          Thanks for coming in, we appreciate it.

17          THE PROSPECTIVE JUROR:  Thank you, Your Honor.

18          THE COURT:  The first thing I need to ask you, is

19  there anything going on in your life that would make it

20  difficult or impossible for you to serve on this jury the next

21  4 or 5 weeks?

22          THE PROSPECTIVE JUROR:  Well, you know, I tell you

23  the truth, Your Honor, I'm not in good health right now.  I

24  was working and after a time I had to retire.  Social security

25  doctor name me disabled.  So I been disabled, so I say about

1 25 years, I retire --

2       THE COURT:  Okay.

3       THE PROSPECTIVE JUROR:   -- with a little small

4 pension.

5       And every time I get an attack, I got to go to the

6 emergency room to get an injection, and sit for hours.  You

7 know, I'm not in good health.  I survive COVID and cancer,

8 still alive today, so.

9       THE COURT:  Right.

10       How often do you get an attack?

11       THE PROSPECTIVE JUROR:  It's hard to say, Your Honor

12 . Hard to say, you know.  Sometimes got to call the EMS, you

13 know.  I stay by my mother, right now.  My mom, 88, she not in

14 good health and she don't want to go down this road because

15 she figure that over the years what she had done to help us

16 out with, you know.

17       THE COURT:  Yes, I understand.

18       THE PROSPECTIVE JUROR:  Yeah, it's time to give

19 back.  I'm sorry, Your Honor.

20       THE COURT:  No, I understand.

21       THE PROSPECTIVE JUROR:  Very sorry.

22       THE COURT:  Any further questions?

23       ALL:  No, Your Honor.

24       THE COURT:  Thank you, sir.  If you just step out

25 that way for a moment, we will be with you in just a second.

1          THE PROSPECTIVE JUROR:  Thank you, Your Honor.

2          (Prospective Juror exits.)

3          THE COURT:  Okay.  Hardship, right?

4          ALL:  Yes, Your Honor.

5          THE COURT:  All right.

6          This is Mr. Blitstein, Juror Number 68.

7          (Prospective Juror enters.)

8          THE LAW CLERK:  Have a seat.

9          THE COURT:  Mr. Blitstein, how are you?

10         THE PROSPECTIVE JUROR:  Good, how are you.

11         THE COURT:  Good, thank you.  Thanks for coming in.

12         The first thing I need to ask you is whether there

13  is anything going on in your life that would make it

14  impossible or close to impossible for you to be on this jury

15  for 4 or 5 weeks.

16         THE PROSPECTIVE JUROR:  Well, you mention the next 4

17  to 6 weeks.  It happens to be very crazy because we have the

18  Jewish holidays coming up.

19         THE COURT:  Oh, we are taking off.

20         THE PROSPECTIVE JUROR:  For Rosh Hashanah, but there

21  are a couple after that.  And then I'm also getting married as

22  well, October 23rd.

23         THE COURT:  Is that your first marriage?

24         THE PROSPECTIVE JUROR:  Yes, it is.

25         THE COURT:  Okay.  If it were your third marriage

                        VB     OCR    CRR

1   then we could, but first marriage, I am not so sure.

2            When are you getting married?

3            THE PROSPECTIVE JUROR:  October 23rd.

4            THE COURT:  Okay.

5            Are you getting married on a Sunday?

6            THE PROSPECTIVE JUROR:  Yes.

7            THE COURT:  And are you going on honeymoon?

8            THE PROSPECTIVE JUROR:  Not yet, no.  Nothing

9   planned yet.

10           THE COURT:  Okay.

11           And I mean, usually it is the bride that has to do a

12  lot of preparation for the wedding.  What do you have to do.

13           THE PROSPECTIVE JUROR:  Keep her sane.

14           THE COURT:  Keep her sane, okay.

15           Okay.  But if you were not here before the wedding,

16  you would be at work, wouldn't you?

17           THE PROSPECTIVE JUROR:  Yes.

18           THE COURT:  Okay.

19           So you are going to be someplace and then, you know,

20  making her sane at night.

21           THE PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Okay.

23           Is that the only thing, you think, that would

24  prevent you from serving.

25           THE PROSPECTIVE JUROR:  Other than also searching

VB     OCR     CRR

1   for apartments, nothing else.

2           THE COURT:  Okay.

3           I will tell you, we are not going to sit five days a

4   week, so you will have some time, although some of that time

5   will be holidays, so.

6           THE PROSPECTIVE JUROR:  Yes.

7           THE COURT:  So you will be in shul, you will not be

8   looking for apartments, but still, there will be some time

9   that we are not sitting that you will be able to devote to

10  your wedding.

11          Let me ask you some questions about the answers you

12  gave on your questionnaire.

13          You answered that a person, the publicly-known

14  person you least admire and why.  You said you don't agree

15  with Donald Trump's politics.  And you know, this case is

16  going to involve possibly testimony from him.

17          THE PROSPECTIVE JUROR:  Right.

18          THE COURT:  Almost likely testimony from others in

19  the former administration.

20          Would you be able to put aside that dislike and

21  judge the facts here neutrally.

22          THE PROSPECTIVE JUROR:  I would try to do my best,

23  yes.

24          THE COURT:  I know you try to do your best, but

25  could you succeed?

1  THE PROSPECTIVE JUROR:  Yes.

2  THE COURT:  Okay.

3  You were asked to describe your views about -- you

4  were asked to describe what you know about the UAE and your

5  views or feelings about that information, and you said the UAE

6  made a peace agreement with Israel.  That is a good thing,

7  right?

8  THE PROSPECTIVE JUROR:  Yeah.

9  THE COURT:  Okay.

10  No bias or prejudice against the UAE in any way?

11  THE PROSPECTIVE JUROR:  I mean, I'm just happy there

12  is peace, but.

13  THE COURT:  Okay.  So are we all.  Okay.

14  You have been in Israel for school.

15  THE PROSPECTIVE JUROR:  Yes.

16  THE COURT:  Back in 2014.

17  And you have strong feelings about Israel's right to

18  exist, which I understand.  I do not think that would pose any

19  issue for this trial.

20  And you supported President Trump's policies on the

21  Israel-Palestinian issue.

22  THE PROSPECTIVE JUROR:  Yeah.

23  THE COURT:  Okay.

24  THE PROSPECTIVE JUROR:  That was probably the only

25  thing I agreed on.

1          THE COURT:  Okay.

2          Any questions from the lawyers?

3          MR. HARRIS:  No.

4          MR. SCHACHTER:  Just a couple questions.

5          Good morning.

6          THE PROSPECTIVE JUROR:  Good morning.

7          MR. SCHACHTER:  You had mentioned, I believe, some

8    feelings about the country of Qatar.  Am I wrong about that?

9    I may be wrong about that.

10          THE PROSPECTIVE JUROR:  No.

11          MR. JACKSON:  Wrong juror.

12          MR. SCHACHTER:  Sorry about that.

13          Then I have no questions.

14          THE COURT:  Okay.

15          MR. JACKSON:   I'm sorry, I do have one question.

16          I just want to make sure we understand because,

17    obviously, we want to make sure that we are able to

18    accommodate everyone's schedule.

19          THE PROSPECTIVE JUROR:  Of course.

20          MR. JACKSON:  In terms of the holidays that you need

21    to take off, which ones specifically are you taking off?

22          THE PROSPECTIVE JUROR:  So there's Rosh Hashanah,

23    next week.  Then there's Yom Kippur, that's the following

24    Wednesday.  And then, the two weeks after that, I know it's

25    hard to remember, but I -- the next Mondays and Tuesdays

1    are -- I wouldn't be able -- they are holidays.  I wouldn't be

2    able to attend.

3              MR. JACKSON:  No, I understand.  I just want to make

4    sure I understand.  Because we have, you know, everybody has

5    different holidays.

6              THE PROSPECTIVE JUROR:  Yeah..

7              MR. JACKSON:  And we're taking some off, but I want

8    to make sure we are on the same page.

9              THE PROSPECTIVE JUROR:  Thank you.

10             MR. JACKSON:  So it's that Monday and following

11   Tuesday?

12             THE PROSPECTIVE JUROR:  So, Monday, Tuesday coming

13   up.  Then there's the next week, it's the Wednesday.  And then

14   the following two weeks after that, it's the Monday-Tuesdays.

15             MR. JACKSON:  Both weeks?

16             THE PROSPECTIVE JUROR:   That's those both weeks.

17             THE COURT:  Is that Sukkot?

18             THE PROSPECTIVE JUROR:  Sukkot, yes.

19             THE COURT:  Okay.

20             MR. LOWELL:   And never forget Shemini Atzeret.

21             THE COURT:  Shemini Atzeret, you are taking off

22   that, too?

23             THE PROSPECTIVE JUROR:  Yes.

24             THE COURT:  I'll spell it for you later.

25             MR. JACKSON:   All right.

1          Thank you very much.

2          THE COURT:  If you will just wait in the hallway for

3    a second, I will be right with you.

4          THE PROSPECTIVE JUROR:  Thank you very much.

5          THE COURT:  Thank you.

6          (Prospective Juror exits.)

7          THE COURT:  Is he taking any holidays that we plan

8    to be working?

9          MR. LOWELL:  Yes.

10          THE COURT:  All right.

11          MR. LOWELL:  He's going to take off -- he's going to

12    take off -- following the Monday of October 10th, which is

13    also a Federal holiday --  the next week, Monday and Tuesday

14    are holidays, if you are as observant as he is observing.

15          THE COURT:  You are not observing those?

16          MR. LOWELL:  I am observing those in a different way

17    than I normally would.

18          THE COURT:  Okay.

19          MR. LOWELL:  To accommodate the schedule of the

20    Court, I have got gotten a dispensation for that.

21          THE COURT:   Oh, wow, thank you for that.

22          MR. LOWELL:  But, all things being equal, I should

23    be where he is.

24          THE COURT:  I understand.

25          So the question is, is that a disqualifying

1  conflict?

2        MR. LOWELL:  The Court would just have to sit

3  additional Friday afternoons, as your wont is to do.

4        THE COURT:  Can we do that?

5        MR. JACKSON:  I like this juror, but I think it's

6  actually throwing a wrench in our schedule in what's already

7  going to be a little bit of a complicated schedule.

8        I think we have enough people that we should

9  probably not try to lose two days in two separate weeks, and

10  then try to figure out what else we can do because we

11  already -- we also, as the Court knows, every single trial we

12  encounter unanticipated things.  Someone needs a surgery,

13  someone has, you know, a child care problem.  If we start

14  missing two days here, two days there, in the middle of the

15  week --

16        THE COURT:  The longer it goes on, the more problems

17  we are going to get.

18        MR. JACKSON:  Exactly.

19        THE COURT:  Any objection?

20        MR. HARRIS:  Your Honor, I don't think we have a

21  strong position either way.

22        THE COURT:  All right.

23        MR. HARRIS:  Obviously, we would like to do the

24  trial expeditiously.  I think if we sit on the Friday we can

25  make up some of the time.  I take Mr. Jackson' s point that

1  there's likely going to be surprises delays anyway, so.

2      THE COURT:  Okay.

3      I am going to exclude him for hardship.

4      (Prospective Juror enters.)

5      THE COURT:  This is Juror Number 148, Dominic

6  Laudato.

7      Mr. Laudato, how are you.

8      THE PROSPECTIVE JUROR:  I'm all right.  You?

9      THE COURT:  Good, thanks.

10      Let me start by asking if there is anything coming

11  up in your life within the next 4 or 5 weeks that might make

12  it impossible or next to impossible for you to serve on this

13  jury.

14      THE PROSPECTIVE JUROR:  I don't believe so.

15      THE COURT:  Okay.

16      Is there anything you are concerned about that you

17  are not telling me that might come up?

18      THE PROSPECTIVE JUROR:  Oh, no.  Lack of sleep.

19      THE COURT:  Well, we all have that.

20      THE PROSPECTIVE JUROR:  Right.

21      THE COURT:  Your grandfather was in the NYPD?

22      THE PROSPECTIVE JUROR:  Yes, I believe I got his

23  title wrong, actually.  I'm still a bit iffy on that.

24  Happens, but yes.

25      THE COURT:  Okay.

1      Any views you have about the criminal justice system

2   based on him being a cop.

3      THE PROSPECTIVE JUROR:  Nope.  Didn't talk about it

4   much, though.

5      THE COURT:  You did not?

6      THE PROSPECTIVE JUROR:  No, he didn't talk that

7   much.

8      THE COURT:  Okay.

9      All right.

10      Now, you said you have written in letters or emails

11   to either talk shows or letters to the editor or web pages or

12   chat rooms and that those involve tech or video games.

13      Is that the extent of it?

14      THE PROSPECTIVE JUROR:  Basically.  Just

15   participated on forums back when I was in high school, so that

16   was years back.

17      THE COURT:  Okay.

18      Any political --

19      THE PROSPECTIVE JUROR:  Nope.

20      THE COURT:   -- participation?

21      Okay.  You have no connection with anybody listed on

22   that long schedule of people and places at the end of the

23   questionnaire.

24      THE PROSPECTIVE JUROR:  No.

25      THE COURT:   Do not know any of them?

1        THE PROSPECTIVE JUROR:  Best of my knowledge, I

2   don't know any of them.

3        THE COURT:  Okay.

4        And you said you followed the 2016 election and news

5   about the Former President Trump  somewhat closely.

6        Did you form any impressions about anything relating

7   to the election or the former president?

8        THE PROSPECTIVE JUROR:  I would say, I suppose, that

9   considering what happened as far as social media, et cetera,

10  and, you know, his participation in such, didn't have the

11  greatest opinion -- I didn't really have the greatest opinion

12  of the former president, but I do not believe that that would

13  impact my ability to -- how would I put it?

14       I'm sorry.  I'm just kind of caught in my words

15  here, but I don't believe it would impact my views in this

16  case.

17       THE COURT:  Okay.

18       What if he or somebody from the administration,

19  prior administration, were to testify as a witness?  If they

20  took the stand, could you evaluate them like any other

21  witness?

22       THE PROSPECTIVE JUROR:  Yes.

23       THE COURT:  All right.

24       Any follow-up?

25       MR. HARRIS:  No.

JURY SELECTION

1       MR. LOWELL:  Nothing.

2       THE COURT:  Okay.

3       All right.  Thank you, sir.

4       If you would just wait outside for a minute, we will

5  be right with you.

6       MR. JACKSON:  Your Honor, I'm sorry.  May I ask one

7  question?

8       THE COURT:  Yes.

9       Just when you thought you were out, they pull you

10  back in.

11      THE PROSPECTIVE JUROR:  Yes.

12      MR. JACKSON:  Thank you.

13      I know you said you posted sometimes online about

14  games.

15      THE PROSPECTIVE JUROR:  Yes.

16      MR. JACKSON:  Just curious, what games you were

17  posting online about?  Like what was the issue?

18      THE PROSPECTIVE JUROR:  We were just discussing, I

19  believe, just -- just general  stuff on them, like what you

20  did in such-and-such game, how you felt about the plot of the

21  game, nothing, you know, nothing major.  Like, could you

22  elaborate?

23      MR. JACKSON:  I just meant like what game.

24      THE COURT:   He is just looking for tips.

25      THE PROSPECTIVE JUROR:  We can discuss those

VB       OCR    CRR

1  characters.

2          It was a series called Hyperdimension Neptunia.  It

3  was the NISA forms, which is a Nippon Ichi Software America.

4  That was back in, had to have been high school, 2012, '13.  I

5  know it's --

6          MR. JACKSON:  No, I get it.  That's great.

7          Thank you so much, thank you.

8          THE PROSPECTIVE JUROR:  No problem.

9          THE COURT:  I'll ask you to step back, please.  We

10  will be right with you.

11          THE PROSPECTIVE JUROR:  This way?

12          THE COURT:  Yes, that way.

13          (Prospective Juror exits.)

14          THE COURT:  I just want to make sure.  You know

15  yesterday, everybody was taking their mask off.  Today, nobody

16  is taking their mask off.

17          Are we sure they understand that they can take their

18  mask off if they want to?

19          THE LAW CLERK:  Yes, I told them.  I took my mask

20  off.  It's up to them.

21          THE COURT:  All right.

22          No challenges?

23          MR. HARRIS:  No.

24          MR. JACKSON:  No.

25          THE COURT:  He is in.

1        This is number 154, Evelyn Martin-De Matas.

2        MR. LOWELL:  I'm sorry.  Can you tell me the number

3   again?

4        THE COURT:  154.

5        (Prospective Juror enters.)

6        THE LAW CLERK:  Please have a seat.

7        THE COURT:  Good morning, ma'am.  How are you?

8        THE PROSPECTIVE JUROR:  Good morning.  All right,

9   thank you.

10       THE COURT:  Okay.

11       First I want to get your proper name.  Should I call

12  you Ms. Martin-De Matas or just Ms. De Matas.

13       THE PROSPECTIVE JUROR:  Ms. De Matas is okay.

14       THE COURT:  Okay.

15       Let me ask you first, is there anything you have got

16  coming up in your life in the next 4 or 5 weeks that would

17  make it impossible or near impossible for you to sit as a

18  juror in this case?

19       THE PROSPECTIVE JUROR:  Well, I'm still working.

20       THE COURT:   You are working?

21       THE PROSPECTIVE JUROR:  Yeah.

22       THE COURT:  Okay.

23       THE PROSPECTIVE JUROR:  And every day I only be paid

24  for the ten days.

25       THE COURT:  You only get up to ten days for serving

1  on a jury?

2          THE PROSPECTIVE JUROR:  Yeah.  Right, yes.

3          THE COURT:  Okay.

4          THE PROSPECTIVE JUROR:  And my daughters live with

5  me and I'm the only one that's working now.

6          THE COURT:   You are going where?

7          THE PROSPECTIVE JUROR:  My daughters live with me

8  and I'm the only one that's working.

9          THE COURT:  Okay.

10          Remind me again, what do you do.

11          THE PROSPECTIVE JUROR:  I'm a pastry cook.

12          THE COURT:  Okay.

13          THE PROSPECTIVE JUROR:  And this is the busy season

14  that's coming up.

15          THE COURT:  Report.

16          And you do not get paid if you are on jury duty.

17          THE PROSPECTIVE JUROR:  Only up to ten days.

18          THE COURT:  Only ten days.  Okay.

19          Is it a big chain or a small bakery?

20          THE PROSPECTIVE JUROR:  I work at the Yale Club.

21          THE COURT:  The Yale Club.

22          THE PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Oh, I know people at the Yale Club.

24          THE PROSPECTIVE JUROR:  You do?

25          THE COURT:  What would happen, do you think, if I

1    called them up and I said, listen, I really need Ms. De Matas

2    to be on my jury.  I need you to pay her while she serves.

3              Do you think they would listen to me?

4              THE PROSPECTIVE JUROR:  I don't know.  They might.

5    I don't know.

6              THE COURT:  Okay.

7              And if they did not pay you, would that be very

8    difficult for you?

9              THE PROSPECTIVE JUROR:  Might be since, you know, my

10   daughters, they lost their jobs during COVID.

11             THE COURT:  Right.

12             THE PROSPECTIVE JUROR:  So.

13             THE COURT:  So you are the only means of support?

14             THE PROSPECTIVE JUROR:  Yeah.

15             THE COURT:  Okay.

16             Any further questions I should ask?

17             MR. HARRIS:  No.

18             MR. JACKSON:  No, Your Honor.

19             THE COURT:  Okay.

20             Thank you, ma'am.  If you just wait outside for us,

21   we will be with you in just a second.

22             THE PROSPECTIVE JUROR:  All right.  Thank you.

23             (Prospective Juror exits.)

24             THE COURT:  Anybody have an in at the Yale Club?

25             MR. HARRIS:  No.

```
 1              THE COURT:  Okay.  She is excused for cause.

 2    Hardship.

 3              (Prospective Juror enters.)

 4              THE COURT:  This is number 157 Orville Lee.

 5    Mr. Orville Lee.

 6              THE LAW CLERK:  Please have a seat.

 7              THE COURT:  Mr. Lee, how are you?

 8              THE PROSPECTIVE JUROR:  Fine.  Thank you.

 9              THE COURT:  Great.  Nice to meet you.

10              Let me first ask you, is there anything happening in

11    your life that would make it impossible or next to impossible

12    for you to be here for the next 4 or 5 weeks.

13              THE PROSPECTIVE JUROR:  No.

14              THE COURT:  Okay.

15              I just want to follow up on some of the answers you

16    gave on your questionnaire, which I know was difficult to fill

17    out.  We appreciate you doing it.

18              In one question you said your least admired person

19    was Former President Trump.  In another part, you were asked

20    if your views of the 2016  presidential campaign or

21    President Trump would prevent you from being fair and

22    impartial considering that the case might involve them, might

23    even involve testimony from them.  And you said no, that would

24    not stop you from being fair and impartial.

25              THE PROSPECTIVE JUROR:  Right.
```

VB      OCR     CRR

1        THE COURT:  How sure are you of that?

2        THE PROSPECTIVE JUROR:  I wouldn't have put it down

3   if I didn't believe it.  I'm sure of it, I mean.

4        THE COURT:  Okay.

5        So if, for example, President Trump were to take the

6   witness stand and testify, you would not automatically you see

7   him on the witness stand and decide I am not going to believe

8   anything he says.

9        THE PROSPECTIVE JUROR:  No.

10       THE COURT:  Okay.

11       You have a former wife who worked for someone in

12  Congress?

13       THE PROSPECTIVE JUROR:  Right.  The Constituent

14  Services.

15       THE COURT:  Okay.

16       Anything about her work that made you favorable or

17  unfavorable to the Government?

18       THE PROSPECTIVE JUROR:  No.

19       THE COURT:  Okay.

20       And I see you followed the 2016 election and news

21  about the former president closely.  Very closely.

22       Again, I just want to make absolutely sure that any

23  views you have about the president you would set aside, no

24  question about that.

25       THE PROSPECTIVE JUROR:  Yes.  I mean, the way I

1  understand, that's what I'd be instructed to do it.

2       THE COURT:  Okay.

3       THE PROSPECTIVE JUROR:  So.

4       THE COURT:  Okay.

5       Any follow-up?

6       MR. HARRIS:  No, Your Honor.

7       MR. JACKSON:  I just have one question, Your Honor.

8       Good morning, sir.

9       THE PROSPECTIVE JUROR:   Hi.

10      MR. JACKSON:  Just wondering, I'm correct that in

11  your work -- could you just remind me again exactly what you

12  do professionally?

13      THE PROSPECTIVE JUROR:  I'm a college professor.

14      MR. JACKSON:  That's what I thought.

15      And does any of your work or your scholarship, your

16  teaching, your research, does any of it touch on any of the

17  stuff that you think is related to this case based on what

18  you've seen in the questionnaire?

19      THE PROSPECTIVE JUROR:  You know, I mean, I have

20  written about political things in the past, but from an

21  academic point of view.  But I don't think with respect to

22  what I think you're asking me, when I'm teaching, when I'm

23  working what I'm working on now, doesn't have anything to do

24  with.

25      MR. JACKSON:  Definitely, I'm not even questioning.

1  I understand like somebody with your professional background

2  would be able to separate.  I'm just talking about the

3  question of do you actually -- is there any aspect of your

4  work that you think touches on, in any way, the issues that

5  you think are potentially at play in this trial, based on what

6  you've seen in the questionnaire?

7          THE PROSPECTIVE JUROR:  I don't know what's going on

8  in the trial.

9          MR. JACKSON:  Okay.

10          THE PROSPECTIVE JUROR:  So I can say that in terms

11  of the question about politics, no, my work does not deal with

12  American politics in the last four years.

13          MR. JACKSON:  Okay.

14          THE PROSPECTIVE JUROR:  So...

15          MR. JACKSON:  Okay.  Thank you.

16          THE COURT:  Okay.

17          THE PROSPECTIVE JUROR:  Teaching or otherwise.

18          THE COURT:  Thank you.

19          Okay.  Sir, if you wait for us in the hall back

20  there, we will be with you in just one minute.

21          (Prospective Juror exits.)

22          THE COURT:  Any challenges?

23          MR. HARRIS:  No, thank you, Your Honor.

24          MR. JACKSON:  No, Your Honor.

25          THE COURT:  Okay.

1              This is number 160.  Joseph Carretta.  160, Joseph

2     Carretta.

3              (Prospective Juror enters.)

4              THE COURT:  Hi, Mr. Carretta.

5              THE PROSPECTIVE JUROR:  Hello.  How are you?

6              THE LAW CLERK:  Please have a seat.

7              THE COURT:  Thanks for coming in.

8              THE PROSPECTIVE JUROR:  You're welcome.

9              THE COURT:  The first question I need to ask you is

10    whether there is anything happening in your life over the next

11    4 or 5 weeks that would make it impossible for you to be here?

12             THE PROSPECTIVE JUROR:  No.

13             THE COURT:  Okay.

14             Let me follow up, then, on just a couple of things

15    you put in your questionnaire.

16             THE PROSPECTIVE JUROR:  Mm-hmm.

17             THE COURT:  You live on Staten Island, right?

18             THE PROSPECTIVE JUROR:  Staten Island, New York ,

19    yeah.

20             THE COURT:  Okay.

21             How would you get here?

22             THE PROSPECTIVE JUROR:  Train and ferry.

23             THE COURT:  Okay.

24             And when you were asked what publicly-known person

25    do you most admire and why, and what publicly-known person do

1   you least admire and why, you said none.

2          I am not just talking about politicians, actors,

3   sports figures.

4          THE PROSPECTIVE JUROR:  Yeah.

5          THE COURT:  Is there anybody you look up to as a

6   person?

7          THE PROSPECTIVE JUROR:  Well, my parents.

8          THE COURT:  Your parents.

9          THE PROSPECTIVE JUROR:  Yeah.

10         THE COURT:  Okay.

11         Now you say you follow politics on a day-to-day

12  basis somewhat.

13         THE PROSPECTIVE JUROR:  Somewhat.

14         THE COURT:  Okay.

15         Have you formed any views that might make it

16  difficult for you to be impartial on a case like this based on

17  what you read in the questionnaire.

18         THE PROSPECTIVE JUROR:  I don't believe so.

19         THE COURT:  Okay.

20         When you say you don't believe so, are you

21  reasonably confident?

22         THE PROSPECTIVE JUROR:  Yes, yes.

23         THE COURT:  All right.

24         Any follow-up?

25         MR. LOWELL:  I have one.

1    THE COURT:  Okay.

2    MR. LOWELL:  You told us that you admire your

3  parents as your most, but you didn't say if there's anybody

4  who you are of the least admiring in the world these days.

5    THE PROSPECTIVE JUROR:  The least admiring.

6    MR. LOWELL:  Yes, the person you admire the least.

7    THE PROSPECTIVE JUROR:  That is a tough question.

8  I, you know, I really don't know, you know.  I'm not -- I

9  don't have a --

10    THE COURT:  You are just too nice a guy.  You do not

11  form negative opinions on people.

12    THE PROSPECTIVE JUROR:  To say I dislike somebody,

13  it just doesn't come.

14    MR. LOWELL:  Not dislike, the opposite of admire.

15    THE PROSPECTIVE JUROR:  Not look up to, despise or

16  whatever, I don't -- it just doesn't come to me naturally.

17    MR. LOWELL:  Thank you.

18    THE COURT:  Okay.

19    Thank you, sir.  If you just wait for us back there

20  in the hall, we will be with you in one minute.

21    THE PROSPECTIVE JUROR:  Sure.  Thank you.

22    (Prospective Juror exits.)

23    THE COURT:  Okay.  No challenges?

24    ALL:  No, Your  Honor.

25    THE COURT:  Okay.

VB    OCR    CRR

1           Juror Number 161, Victor Schappe.  S-C-H-A-P-P-E.

2           (Prospective Juror enters.)

3           THE COURT:  Mr. Schappe, how are you?

4           Am I pronouncing your name right.

5           THE PROSPECTIVE JUROR:  Schappe.

6           THE COURT:  Schappe.  There were two choices and I

7    made the wrong one.  Sorry about that.

8           The first thing I need to ask you, Mr. Schappe, is

9    there anything going on in your life that would make it

10   impossible or nearly impossible for you to be with us for 4 or

11   5 weeks?

12          THE PROSPECTIVE JUROR:  That's a long time.

13          THE COURT:  It is.  Long time for us, too.

14          THE PROSPECTIVE JUROR:  I don't know.

15          THE COURT:  Do you have anything planned?  Any trip

16   around the world?  Any surgical procedure you cannot get out

17   of?  Nothing like that?  No?

18          THE PROSPECTIVE JUROR:  My job.  I don't know.

19          THE COURT:  I'm sorry.  Your job?

20          THE PROSPECTIVE JUROR:  Job.

21          THE COURT:  Okay.

22          THE PROSPECTIVE JUROR:  I'm 32 years there.

23          THE COURT:  You are 22 years  where?

24          THE PROSPECTIVE JUROR:   32 years.

25          THE COURT:  Where?

1          THE PROSPECTIVE JUROR:  In Manhattan.  It's

2    AllianceBernstein mailroom.

3          THE COURT:  You work in the mailroom there.

4          THE PROSPECTIVE JUROR:  32 years.

5          THE COURT:  Okay.

6          Do you ever want to retire?

7          THE PROSPECTIVE JUROR:  Soon.

8          THE COURT:  Okay.

9          Do you know if they would pay you for the time you

10   spent here if you were not working for them?

11         THE PROSPECTIVE JUROR:  I don't know.

12         THE COURT:  You don't know?

13         THE PROSPECTIVE JUROR:  No.

14         THE COURT:  Okay.

15         If you didn't get paid for 4 or 5 weeks, how hard

16   would that be on you?

17         THE PROSPECTIVE JUROR:  Hmm.

18         THE COURT:  Do you think you could handle that?

19         THE PROSPECTIVE JUROR:  No.

20         THE COURT:  Okay.

21         Any further questions?

22         MR. HARRIS:  No, Your Honor.

23         MR. JACKSON:  No, Your Honor .

24         THE COURT:  Okay.

25         Thank you, sir.  If you would just step out there

1    for a moment, we will be right with you.

2              (Prospective Juror exits.)

3              THE COURT:  Okay.

4              I think hardship and probable cause.

5              Anyone dispute that?

6              MR. HARRIS:  No, Your Honor.

7              MR. JACKSON:  No.

8              THE COURT:  Okay.

9              All right.  This is 170, Lauralee Quinlan.

10             (Prospective Juror enters.)

11             THE LAW CLERK:  Please have a seat.

12             THE COURT:  Ms. Quinlan, how are you?

13             THE PROSPECTIVE JUROR:  Fine.  Good morning.

14             THE COURT:  Good morning.  Thank you for coming, not

15   like you had any choice, but we do appreciate it.

16             Let me start by asking if there is anything coming

17   up in your life over the next 4 or 5 weeks that --

18             THE PROSPECTIVE JUROR:  I wish there was.

19             THE COURT:  There is nothing going to stop from you

20   being here?

21             THE PROSPECTIVE JUROR:  No.

22             THE COURT:  Okay.  I just want to follow up on a

23   couple of questions from your questionnaire.

24             THE PROSPECTIVE JUROR:  Sure.

25             THE COURT:  You mentioned that religion is very

1  important in your life, which is good.  I just want to make

2  sure, you know, the law usually works hand in hand with

3  religion.

4          It is usually the same, but if I had to give you an

5  instruction that you thought, gee, you know, the Bible says

6  something different, could you follow my instruction in this

7  case?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Okay.

10          Does your religion give you any problem in sitting

11  in judgment over someone.

12          THE PROSPECTIVE JUROR:  No.  I don't -- I'm not --

13          THE COURT:  You are not that super religious.

14          THE PROSPECTIVE JUROR:  Exactly.

15          THE COURT:  Okay.

16          THE PROSPECTIVE JUROR:  If that's what you want to

17  call it, super.

18          THE COURT:  Yes.  I did not know what else to call

19  it.  If you can think of a better word, I am happy to use it.

20          THE PROSPECTIVE JUROR:  It's fine.  That's perfect.

21          THE COURT:  Okay.

22          You most admired Winston Churchill.

23          THE PROSPECTIVE JUROR:  I was lost for words.  It's

24  like, think, think, Lauralee.

25          THE COURT:  I think everybody admires --

1      THE PROSPECTIVE JUROR:  I got to the end of the

2  booklet, I was like...

3      THE COURT:  And there was not anyone you could think

4  of who you least admire?

5      THE PROSPECTIVE JUROR:  I can right now.

6      THE COURT:  Oh, who is that?

7      THE PROSPECTIVE JUROR:   After I thought about it.

8      THE COURT:  Yes.  Who?

9      THE PROSPECTIVE JUROR:  Putin.

10      THE COURT:  Putin.  Okay.

11      I am not going to ask any questions about that.

12      THE PROSPECTIVE JUROR:  Don't.

13      THE COURT:  I think the answer's well known enough.

14      You spent a lot of time on Instagram; is that right?

15      THE PROSPECTIVE JUROR:  Not a lot of time.

16      THE COURT:  A little time?

17      THE PROSPECTIVE JUROR:  I mean, it asked the

18  question, so I -- yeah, very little.

19      THE COURT:  So it would not be any problem for you

20  if I said do not look at anything pertaining to this case.

21      THE PROSPECTIVE JUROR:  Not at all.

22      THE COURT:  Okay.

23      THE PROSPECTIVE JUROR:  Not at all.

24      THE COURT:  Okay.

25      THE PROSPECTIVE JUROR:   I do it when I can't sleep.

JURY SELECTION

1    THE COURT:  Thank you.

2    That is all I have.  Any follow-up?

3    MR. HARRIS:  No, Your Honor.

4    MR. LOWELL:  No, Your Honor.

5    MR. JACKSON:  No, Your Honor.

6    THE COURT:  Thank you, Ms. Quinlan .

7    If you just wait out there for us for just a minute,

8  we will be with you in a minute.

9    THE PROSPECTIVE JUROR:  Okay.  Perfect.  Thanks.

10    (Prospective Juror exits.)

11    THE COURT:  Okay.  No challenges?

12    MR. HARRIS:  No, Your Honor.

13    MR. JACKSON:  No, Your Honor .

14    THE COURT:  172, Patricia Benjamin.

15    (Prospective Juror enters.)

16    THE LAW CLERK:  Please have a seat.

17    THE PROSPECTIVE JUROR:  Thank you.

18    THE COURT:  Ms. Benjamin, how are you?

19    THE PROSPECTIVE JUROR:  I'm fine.  Thank you.

20    THE COURT:  Thank you for coming.

21    THE PROSPECTIVE JUROR:  Thank you.

22    THE COURT:  The first question I need to ask you is,

23  is there anything happening in your life over the next 4 or

24  5 weeks that might make it impossible for you to spend that

25  time with us?

VB     OCR     CRR

1          THE PROSPECTIVE JUROR:  No.

2          THE COURT:  Nothing like that.

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  Okay.

5          Also I noticed on your questionnaire that you

6     checked that religion is very important to you.

7          Do you think there would be any problem with you

8     following instructions on the law that I give you if you

9     thought they were different from what you learned in the

10    Bible?

11         THE PROSPECTIVE JUROR:  No.

12         THE COURT:  No?  No problem.

13         THE PROSPECTIVE JUROR:  No problem.

14         THE COURT:  Okay.

15         This is a unique answer to this question.  I have

16    never seen this before.

17         What publicly-known person do you most  admire and

18    why.

19         And you said lawyers, because they fight cases.

20         Everyone here is very complimented by that.  But

21    interestingly, you also said what publicly-known person do you

22    least admire and why?  And you said --

23         THE PROSPECTIVE JUROR:  Judge.

24         THE COURT:  No, you did not say judge.

25         You said -- that would be funny.

1              But you said police.  No reason.

2              And I am wondering why it jumped into your mind that

3     the police should be the people you least admire.

4              THE PROSPECTIVE JUROR:  I least admire -- there's no

5     reason.

6              THE COURT:  No reason?

7              THE PROSPECTIVE JUROR:  No.

8              THE COURT:  Okay.

9              We are going to hear in this trial from witnesses

10    who are involved with law enforcement.

11             THE PROSPECTIVE JUROR:  Yeah.

12             THE COURT:  And I want to make sure if you hear one

13    of those witnesses on the stand you do not think, oh, I should

14    not believe this person because he is with law enforcement.

15             Can you avoid having that reaction?

16             THE PROSPECTIVE JUROR:  Yes.

17             THE COURT:  No problem with that?

18             THE PROSPECTIVE JUROR:  No problem.

19             THE COURT:  Okay.

20             Now you mentioned that you follow politics daily,

21    somewhat closely.

22             THE PROSPECTIVE JUROR:  Yeah.

23             THE COURT:  Have you formed any strong political

24    views?

25             THE PROSPECTIVE JUROR:  No.

1          THE COURT:  No?  Okay.

2          And you said that you followed very closely the 2016

3     presidential election and news about Former President Trump.

4          Did you form any views about that?

5          THE PROSPECTIVE JUROR:  No.

6          THE COURT:  Do you have any views at all about the

7     former president?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  Okay.

10          So if, for example, either the former president or

11     people from his administration, if they were to take the

12     witness stand in this case, you would not have anything that

13     you would hold against them?

14          THE PROSPECTIVE JUROR:  No.

15          THE COURT:  Okay.

16          Any questions from the lawyers?

17          MR. HARRIS:  I have just one, Your Honor.

18          THE COURT:  Okay.

19          MR. HARRIS:  Good morning.

20          THE PROSPECTIVE JUROR:  Good morning.

21          MR. HARRIS:  So you mentioned that you most admire

22     lawyers, which we all appreciate, thank you.  There are lots

23     of lawyers in this case.  Some of them represent the

24     defendants and some of them represent the Government.

25          Would you feel any differently about a lawyer

1  because he represented a defendant or the Government?

2           THE PROSPECTIVE JUROR:  No.

3           MR. HARRIS:  Okay.  Thank you.

4           MR. LOWELL:  I have one.

5           THE COURT:  Please.

6           MR. JACKSON:  Good morning, ma'am.

7           THE PROSPECTIVE JUROR:  Good morning.

8           MR. JACKSON:  I think you said that you watch a lot

9  of court shows on TV.

10          THE PROSPECTIVE JUROR:  Yes.

11          MR. JACKSON:  Can you just tell us what some of them

12 are?  Or any of them?

13          THE PROSPECTIVE JUROR:  I admire like Judge Judy .

14 I admire her a lot.

15          MR. JACKSON:  That's great.  Thank you.

16          MR. LOWELL:  So good morning.

17          I saw that you said you have two children, two adult

18 children?  How old are your children?

19          THE PROSPECTIVE JUROR:  I have six kids.

20          THE COURT:  Oh, my goodness.

21          MR. LOWELL:  What's the age range?

22          THE PROSPECTIVE JUROR:  42 to 19.

23          MR. LOWELL:  Thank you.

24          THE COURT:  All right.  Thank you, ma'am.

25          If you just wait for us out there, we will be with

1  you in one minute.

2          THE PROSPECTIVE JUROR:  Thank you.

3          (Prospective Juror exits.)

4          THE COURT:  She admires lawyers.  Is that cause?

5          MR. HARRIS:  Question her judgment, Your Honor.

6          THE COURT:  No challenges, right?

7          MR. HARRIS:  No.

8          MR. JACKSON:  No, Judge.

9          THE COURT:  This is Juror 175.  Hard to pronounce.

10  Obmana , I would say.  Obmana.

11          (Prospective Juror enters.)

12          THE LAW CLERK:  Have a seat.  You can take your mask

13  off.

14          THE PROSPECTIVE JUROR:  I have bad allergy.

15          THE COURT:  If you want to leave your mask on, it is

16  fine.  Do you want us to put a mask on?

17          THE PROSPECTIVE JUROR:  No, it's fine.  I'm the one.

18          THE COURT:  First tell me, how do you pronounce your

19  name?

20          THE PROSPECTIVE JUROR:  Rosa Obmana.

21          THE COURT:  Obmana.  Okay.  Thank you.

22          Is there any reason, anything happening in your

23  life, that would make it impossible for you to spend 4 or

24  5 weeks with us to do this trial?

25          THE PROSPECTIVE JUROR:  The only thing,  really, is

1  I have my back.  I cannot sit for too long.  I have to stand

2  up like, every 1 or 2 hours.

3           THE COURT:  Okay.

4           THE PROSPECTIVE JUROR:  Because if not, my legs is

5  getting numb.

6           THE COURT:  Right.  Several of us in this case have

7  that problem.

8           If I were to tell you that it is fine, any time you

9  want to stand up during the case, even when you are on the

10 jury, it is fine.  Would that solve the problem for you?

11          THE PROSPECTIVE JUROR:  Yeah.

12          And I'm traveling by November.

13          THE COURT:  When in November?

14          THE PROSPECTIVE JUROR:  Around after Thanksgiving.

15          THE COURT:  Okay.

16          THE PROSPECTIVE JUROR:  I will be out for two

17 months.

18          THE COURT:  Oh, where are you going?

19          THE PROSPECTIVE JUROR:  My country.  Philippines.

20          THE COURT:  Back to Philippines?

21          THE PROSPECTIVE JUROR:  Yeah.

22          THE COURT:  Okay.  We will be done by then.  We will

23 not stop your Thanksgiving travel.

24          Okay.  Just a few questions I wanted to follow up

25 on, on your questionnaire.

1    You said that religion is very important in your

2  life, and I just wanted to ask, would you be able to follow

3  instructions on the law that I give you, even if you thought

4  maybe the Bible says something different?

5    THE PROSPECTIVE JUROR:  I would consider that.

6    THE COURT:  You would follow my directions?

7    THE PROSPECTIVE JUROR:  If it's within the law, I

8  will follow.

9    THE COURT:  Okay.  Do your religious views give you

10  any problem about sitting in judgment over someone?

11    THE PROSPECTIVE JUROR:  No.

12    THE COURT:  No?  Okay.

13    You said that you most admire journalists because

14  they give an update for everyday life.  And you least admire

15  celebrities because, I cannot quite read what you said, but it

16  looks like they do everything for themselves?

17    THE PROSPECTIVE JUROR:  They -- most of them wants

18  to be famous, I guess.

19    THE COURT:  Yeah.

20    THE PROSPECTIVE JUROR:  And they do everything just

21  to be on the spotlight.

22    THE COURT:  Okay.

23    And what you do like about journalists?

24    THE PROSPECTIVE JUROR:  Basically, they're

25  knowledgeable.  They go around the country and they update us

JURY SELECTION

1    for the whatever's happening within -- not only with the

2    politics or anything, but in everyday life.

3              THE COURT:  Okay.

4              Well, we have several journalists in this courtroom

5    right now.  They may ask you for your autograph.

6              THE PROSPECTIVE JUROR:  I just want them, you know,

7    because you know how they are.

8              THE COURT:   Yes.

9              Okay.  You followed the 2016 presidential  election

10   and news about Former President Trump somewhat closely, you

11   said.

12             Do you remember saying that?  Do you want me to show

13   you?

14             THE PROSPECTIVE JUROR:  No, no, I remember.

15             THE COURT:  I just want to know if you formed any

16   strong beliefs or opinions about the election or about Former

17   President Trump ?

18             THE PROSPECTIVE JUROR:  Um --

19             THE COURT:  You can say, you are among friends.

20             THE PROSPECTIVE JUROR:  I follow the politics.  I

21   follow the news almost, like, I listen to the news every day

22   but, you know, whatever is really good for the country and for

23   everyone, I think whatever is the opinion of politics, I

24   weigh, you know, which is better for everyone.

25             THE COURT:  Okay.

1          Could you put aside any political views that you

2   might have in considering the testimony of witnesses in this

3   case?

4          THE PROSPECTIVE JUROR:  Yeah, I will consider.

5          THE COURT:  Okay.

6          When you say you will consider it, does that mean

7   you can do it?

8          THE PROSPECTIVE JUROR:  Like... 100 percent?

9          THE COURT:  Yes – – well, I am not sure we can say a

10  hundred percent about anything.  But like, reasonably certain

11  that you could do it.

12         THE PROSPECTIVE JUROR:  If it's within the legality,

13  I would consider it.

14         THE COURT:  Okay.

15         So for example, if we had either Former

16  President Trump or some people from his administration

17  testifying as witnesses here, could you evaluate their

18  testimony the same way you would any other witness?

19         THE PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Okay.

21         Now, I understand you are not going to be paid by

22  your employer while you are here on jury service; is that

23  right?

24         THE PROSPECTIVE JUROR:  I'm retired already.

25         THE COURT:  I am sorry?

1            THE PROSPECTIVE JUROR:  I'm retired.

2            THE COURT:  Oh, you are retired.  Okay.  That is

3    fine.

4            And you also mentioned that you have some difficulty

5    with hearing.

6            Are you hearing me okay now?

7            THE PROSPECTIVE JUROR:  Like, close.

8            THE COURT:  Yes.

9            THE PROSPECTIVE JUROR:  But you know, with my left,

10   you know.  Sometimes I -- if a little far, I have a little

11   difficulty.

12           THE COURT:  Okay.

13           THE PROSPECTIVE JUROR:  I have to ask them to repeat

14   several times.

15           THE COURT:  Okay.

16           And do you wear hearing aids?

17           THE PROSPECTIVE JUROR:  No.

18           THE COURT:  Okay.

19           Have you ever been evaluated to see if you need

20   them?

21           THE PROSPECTIVE JUROR:  Actually, I was just

22   evaluated by ENT and they say it's not that severe.  It's

23   somewhat mild, and I have to be followed  up every like 4 to 6

24   months.

25           THE COURT:  Okay.

1        All right.  Any follow-up from the lawyers?

2        MR. HARRIS:  No, Your Honor.

3        MR. LOWELL:  No.

4        MR. JACKSON:   Your Honor, I just have one question.

5        Good morning, ma'am.

6        THE PROSPECTIVE JUROR:  Yes.

7        MR. JACKSON:  I understand that you said that you

8   have to stand up every so often for your back.

9        THE PROSPECTIVE JUROR:  Yeah.

10        MR. JACKSON:  I've had back issues.

11        THE PROSPECTIVE JUROR:  Sorry.  My L-4 and L-5, the

12   lumbar is affected.

13        MR. JACKSON:  Yes.  I'm sorry about that.

14        I just wonder, some people think over the course of

15   a long trial, this is going to be several weeks, that they are

16   going to be okay with sitting each day, and I just wondered,

17   do you feel confident that you're going to be okay sitting for

18   the weeks or do you think it's going to be a problem?

19        THE COURT:  Assuming you can stand up whenever you

20   need to.

21        THE PROSPECTIVE JUROR:  I can try, but actually, I'm

22   taking also medication for my bone.

23        MR. JACKSON:  For your bone?

24        THE PROSPECTIVE JUROR:  Yeah.

25        MR. JACKSON:  For the vertebrae?

1          THE PROSPECTIVE JUROR:  Not exactly, but I have

2     osteoporosis.

3          MR. JACKSON:  Oh, I see.  Okay.

4          THE COURT:  So you are taking calcium for that?

5          THE PROSPECTIVE JUROR:  I take calcium and the

6     Fosamax.

7          THE COURT:  Okay.

8          MR. JACKSON:  So I'm just wondering, I know when you

9     say you can try, do you feel like that's something that you're

10    going to be okay doing, or do you feel like it's going to be

11    difficult for you like it's going to be a challenge for you to

12    sit for those weeks?

13         THE PROSPECTIVE JUROR:  I would like, but honestly,

14    for my physical, that's why I retired early.  I cannot really,

15    even bending, I cannot really bend.

16         MR. JACKSON:  So you think that sitting for some

17    time is going to be difficult?

18         THE PROSPECTIVE JUROR:  If I would be allowed, but

19    like it's going to be a distraction, you know, I keep the --

20    have to be walking and standing up.

21         THE COURT:  That is the question.

22         You see what I do not want to have happen is, like I

23    said, you can stand up whenever you want, not a problem.  But

24    if your mind is elsewhere because you are in pain --

25         THE PROSPECTIVE JUROR:  Yeah, that's the problem.  I

1  have pain.

2          THE COURT:  Okay.  That is a problem for you?

3          THE PROSPECTIVE JUROR:  I take some, but not

4  regular.  If I have pain, I take.  And I go to physical

5  therapy not -- because of the pandemic, I stopped going and,

6  but honestly, for myself, standing too long, even in the

7  plane, I have to walk and wiggle my legs like this and

8  stretch.

9          THE COURT:  Okay.

10          THE PROSPECTIVE JUROR:  I have no problems with the

11  jury.  I been to jury duty before.

12          THE COURT:  Okay.

13          THE PROSPECTIVE JUROR:  The thing with my back

14  really is the problem.

15          THE COURT:  Okay.

16          Let me just make sure, though.  I want to make sure

17  that you will be able to follow the proceedings in court and

18  not be distracted because you are thinking, oh, my back hurts.

19          THE PROSPECTIVE JUROR:  That's the thing.  Honestly,

20  for myself, I feel --  I want to be comfortable with other

21  groups.

22          THE COURT:  Yes.

23          THE PROSPECTIVE JUROR:  And I want to be with the

24  group, with the team or the panel, but if I'm in pain, that's

25  going to be something I would consider.

JURY SELECTION

1          THE COURT:  Okay.

2          And do you think if you can stand up whenever you

3  want that would eliminate the pain, or you think that you

4  would still have distracting pain, even if you could stand up?

5          THE PROSPECTIVE JUROR:  It's not really -- sometimes

6  it's just calm, like.  Any day.  But probably I will take

7  medication first.

8          THE COURT:  Okay.

9          THE PROSPECTIVE JUROR:  But I have a problem with my

10  stomach.  I cannot take too much medication.

11          THE COURT:  Right.

12          What kind of medication do you take for your back

13  pain.

14          THE PROSPECTIVE JUROR:  They gave me before

15  something like Tylenol with codeine.

16          THE COURT:  Okay.

17          THE PROSPECTIVE JUROR:  But I don't take, really.

18          THE COURT:  You don't take that anymore?

19          THE PROSPECTIVE JUROR:  I just take on and off

20  Motrin.

21          THE COURT:  Okay.  On and off?

22          THE PROSPECTIVE JUROR:  Motrin.

23          THE COURT:  Motrin.

24          Okay.  Anything else?

25          MR. JACKSON:  No, Your Honor .

1        THE COURT:  All right.

2        MR. HEEREN:   Your Honor, I'm sorry.

3        THE COURT:  Yes, go ahead.

4        MR. HEEREN:  You mentioned you served on a jury

5   before.  When was that and how long was the jury sitting for?

6        THE PROSPECTIVE JUROR:  I was always called in our

7   county in Queens, in Sutphin Boulevard.  I think like, the

8   last time I was able to sit for the whole week.  I was elected

9   to, but they have a settlement, so we were dismissed.  But

10  maybe it's like 4 or 5 years ago?  I can't remember.

11       THE COURT:  And how long was that trial?

12       THE PROSPECTIVE JUROR:  It took me like, a week

13  like.

14       THE COURT:  Okay.

15       THE PROSPECTIVE JUROR:  Three, four days, but the

16  case was settled, so we were dismissed.

17       THE COURT:  Okay.

18       MR. HEEREN:  And during those 3, 4 days, did you

19  have any issues serving?

20       THE PROSPECTIVE JUROR:  I have no issue.

21       MR. HEEREN:  Okay.

22       THE PROSPECTIVE JUROR:  That time, I -- I'm still

23  feeling fine.

24       MR. HEEREN:  Yeah, of course.

25       THE PROSPECTIVE JUROR:  But you know, probably with

1    the age, too, that's why I retired early, because, you know.

2                THE COURT:  Okay.

3                MR. HEEREN:  I understand.

4                THE COURT:  All right.  Thank you, ma'am.

5                Just wait for us out in the hall for a minute, we

6    will be right with you with you.  Someone will take you out.

7                THE PROSPECTIVE JUROR:  Thank you so much.

8                (Prospective Juror exits.)

9                THE COURT:  Any challenges?

10               MR. HARRIS:  No.

11               MR. JACKSON:  Yes, Your Honor.

12               We like this juror, but I think what she was trying

13   to say, repeatedly, I think she was being very respectful of

14   the Court because she didn't want to avoid jury service, but

15   she said several times:  To be honest, yes.

16               When she was being asked the question directly about

17   whether she thought she was going to be distracted by the pain

18   of her back, whether it could be a real problem for her.  She

19   said sometimes she feels the need to walk around, sometimes

20   she feels the need to take medicine, but she's concerned she

21   can't take too much medicine because her stomach is a problem.

22

23               I just think, Judge, this particular juror, she's

24   going to get a week into this and the discomfort is going to

25   be very significant.  We're going to have weeks left to go.

1    It just seems like an unnecessary risk, Your Honor.

2         THE COURT:  What gives me pause is that the only

3    treatment she is taking is Motrin, right?  So it cannot be

4    that serious.

5         MR. JACKSON:  Your Honor, I respectfully, I think

6    that that may -- I don't think that's correct now.

7         I mean, I've talked to -- I personally had a back

8    problem at one point.  I've talked to doctors.  Especially

9    today, doctors have gotten very nervous about prescribing

10   opioids and people have gotten very nervous about prescribing

11   opioids, so what they do is they prescribe Motrin in very high

12   amounts.  And people who don't have a problem with it, they

13   immediately say, I don't have a problem.  People who

14   repeatedly go back to the fact they have to take Motrin,

15   they're concerned about their back pain.  The Motrin is only

16   doing so much for them.

17        And she is not, it sounds like -- it sounds like

18   whatever she was doing for work, it was so bad, she said

19   multiple times she had to retire early.  And she has not

20   experienced this, yet.  It is very difficult, as the Court

21   knows, to get  -- if you're not used to it, to sit in these

22   chairs, even if you stand, for weeks.  And we're going to be

23   here for a while.

24        MR. MEHTA:   Your Honor, if I may.

25        I don't want to get into a medical discussion about

1    this, so we should take the witness's word on this.  I have

2    the same exact issue she has, L-4, L-5, I had two back

3    surgeries.  I can tell you actually a lot more than Motrin.

4    Every day I'd take gabapentin, take muscle relaxants, I take

5    Motrin as well, and I sit for weeks on end and several times.

6            I mean, I stand up -- so I think just -- I don't

7    want to get into a back-and -forth about my personal knowledge

8    here, but I just think that if the witness -- sorry, the

9    potential juror indicates that she can do it, then I think we

10   should let her off.

11           MR. JACKSON:  She didn't say that.  To be fair,

12   Mr. Mehta, not much, but he's slightly, he's slightly more,

13   you know, he's slightly, probably, more well-positioned than

14   the juror.

15           THE COURT:  Look, it is a close question because she

16   might never have a problem being here; but she might.  But

17   does it rise to the level where it is a real risk?  I mean,

18   that is what I am looking at.  Is it a real risk or is it a

19   possibility?

20           MR. HEEREN:   Your Honor, just one other fact I

21   would point out is that with regard to the prescription, she

22   indicated she was prescribed Tylenol with codeine and she said

23   she didn't take it.  So this is a not an issue of somebody who

24   is not getting the medication she may well need.  She's

25   saying, as I understand it, she got painkillers.  She doesn't

1  need it, she's taking Motrin.

2          MR. SCHACHTER:   But Your Honor, the juror said

3  she -- I mean, Mr. Mehta said he would take her at her word,

4  which her word was each time the Court asked would she be

5  distracted, she said:  Honestly, yes, because of the

6  discomfort that she is constantly in.

7          So I didn't see any reason to question her

8  credibility.

9          MR. HARRIS:  What I took her, Your Honor, to be

10  saying was that if she couldn't stand up, she would be

11  distracted.

12          I think that, you know, there's three rows here,

13  we're not going to be using all three rows.  She can certainly

14  stand it up in the back  without distracting anybody else.

15  We're not going to be sitting five days anyway with this jury.

16  So I think that she's going to -- in fact, we're going to have

17  a five-day break coming up.

18          I'm not convinced this trial is going to be the

19  standard 5- or 6-week trial where we're sitting 5 days a week.

20  That's a totally different circumstance.  This is not that.

21          MR. SCHACHTER:  She did not say that she couldn't be

22  distracted if --

23          THE COURT:  She was ambiguous, okay?  Her answers

24  were not entirely clear.

25          We are going to keep her.  If she gets on the jury,

1  we will watch closely.  If we need to substitute an alternate,

2  we will.  If I see she is in pain , then you will tell me,

3  aha, Judge, I told you so.  But I have a feeling she will make

4  it through comfortably.

5         MR. JACKSON:  Thank you, Judge.

6         (Continued on following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court.)

2        THE COURT:  This is Menahil Khan.

3        Ms. Khan, how are you?

4        THE PROSPECTIVE JUROR:  I am good.

5        THE COURT:  If you could just move half a foot

6   closer so we can hear you better, and try to speak up.

7        THE PROSPECTIVE JUROR:  Uh-huh.

8        THE COURT:  You're moving to Suffolk, right?

9        THE PROSPECTIVE JUROR:  My family is moving there by

10   the end of this week.

11        THE COURT:  And so they'll be in the new house at

12   the beginning of next week?

13        THE PROSPECTIVE JUROR:  Uh-huh.

14        THE COURT:  And what's your role in the move?  What

15   will you need to do to make that happen?

16        THE PROSPECTIVE JUROR:  It's going to take about a

17   two-hour commute for me to come to the city every day.

18        THE COURT:  And how would you get here if you had to

19   do it?

20        THE PROSPECTIVE JUROR:  I would take the train.

21        THE COURT:  Anything else besides the move that

22   would prevent you from staying with us for four or five weeks?

23        THE PROSPECTIVE JUROR:  No, that's it.

24        THE COURT:  And remind where are your family moving

25   in Commack?  In Commack, was it?

JURY SELECTION

1      THE PROSPECTIVE JUROR:  East Northport.

2      THE COURT:  East Northport?

3      THE PROSPECTIVE JUROR:  Uh-huh.

4      THE COURT:  I don't know how far out that is.  How

5  close is that to Nassau?

6      THE PROSPECTIVE JUROR:  From Nassau to there, I

7  would say about 25, 30 minutes.

8      THE COURT:  So that's like the middle of Suffolk,

9  right?

10     THE PROSPECTIVE JUROR:  Uh-huh.

11     THE COURT:  Okay.  Let me ask you a few questions

12  about some of the answers you gave on your questionnaire.

13     First, you said that religion is very important in

14  your life, and that's good.  Is there any reason that your

15  religion might make it difficult for you to follow my

16  instructions on the law?

17     THE PROSPECTIVE JUROR:  No.

18     THE COURT:  No.  Okay.

19     I take it you live with your parents; is that right?

20     THE PROSPECTIVE JUROR:  Uh-huh.

21     THE COURT:  That's all I've got.  Anything further

22  from the parties?

23     MR. HARRIS:  No, your Honor.

24     MR. JACKSON:  No, your Honor.

25     MR. SCHACTER:  I'm sorry, your Honor, questions

1    about following the election, your Honor?

2              THE COURT:  Go ahead.

3              MR. SCHACTER:  Good morning.

4              THE PROSPECTIVE JUROR:  Good morning.

5              MR. SCHACTER:  You had said that you somewhat

6    closely followed the 2016 election.

7              THE PROSPECTIVE JUROR:  Uh-huh.

8              MR. SCHACTER:  In doing so, did you form any

9    particularly strong political views?

10             THE PROSPECTIVE JUROR:  No.

11             THE COURT:  Okay.  All right.  Thank you.  If you'll

12   wait for us right out in that hall, please, we'll be back to

13   you in just a minute.

14             THE PROSPECTIVE JUROR:  Okay.  Thank you.

15             (Prospective Juror exits the courtroom.)

16             THE COURT:  Any challenges?

17             MR. HARRIS:  No, your Honor.

18             MR. JACKSON:  No, your Honor.

19             THE COURT:  Okay.  This is number 185, Margarita

20   Ramos.

21             MR. JACKSON:  Your Honor, after this juror, would

22   the Court mind if we took a brief recess?

23             THE COURT:  Sure.  You want to take it now?

24             MR. JACKSON:  No, we can take this juror.

25             MR. HEEREN:  What was the number?

1    THE COURT:  185.

2         (Prospective Juror enters the courtroom.)

3         THE COURT:  Ms. Ramos, how are you?

4         THE PROSPECTIVE JUROR:  Fine, thank you.

5         THE COURT:  The first thing I want to ask you is, is

6    there anything about your schedule in the next four or five

7    weeks or anything else in your life that would make it

8    impossible for you to spend four or five weeks with us?

9         THE PROSPECTIVE JUROR:  Okay.  I have a concern

10   because my daughter will have a surgery on November 14th, but

11   I think maybe I have time.

12        THE COURT:  Okay.  Is it a routine surgery?

13        THE PROSPECTIVE JUROR:  Umm.

14        THE COURT:  I don't want you to have to tell me the

15   details, but, you know, how long do you expect her to be in

16   the hospital?

17        THE PROSPECTIVE JUROR:  Okay.  It's -- I believe she

18   will be like two days in the hospital, but she's in

19   California.

20        THE COURT:  Oh, she's in California.

21        THE PROSPECTIVE JUROR:  Yes.

22        THE COURT:  Do you have to go to California --

23        THE PROSPECTIVE JUROR:  Yes.

24        THE COURT:  -- to be with her?  Okay.  That's an

25   issue.  And what's the date of the surgery?

1    THE PROSPECTIVE JUROR:  November 14th.

2    THE COURT:  So you might have to be gone, let's say,

3 the weekend is November 12th, she's having surgery on Monday,

4 and she might need you for a couple of days, right?

5    THE PROSPECTIVE JUROR:  Yes.

6    THE COURT:  Is she married?

7    THE PROSPECTIVE JUROR:  Yes.

8    THE COURT:  She has a husband who is going to be

9 with her?

10    THE PROSPECTIVE JUROR:  Yes, but he's in the

11 military, and he's doing a lot of things because he's going to

12 retire.

13    THE COURT:  Okay.  But can he spend the time with

14 her during the surgery?

15    THE PROSPECTIVE JUROR:  She want me to be with her.

16    THE COURT:  Okay.  Any other questions that I

17 should --

18    MR. JACKSON:  No, your Honor.

19    THE COURT:  -- ask?

20    MR. HARRIS:  I think at this point it's worth

21 proceeding with the rest of the questions.

22    THE COURT:  Okay.  Let me just follow up with you on

23 a few of the answers you gave on your questionnaire.

24    First, you said your religion is very important to

25 you, which is good.  I just want to make sure that it wouldn't

1    in any way prevent you from following the legal instructions

2    that I might give in this case.  Can you do that?

3              THE PROSPECTIVE JUROR:  Yes.

4              THE COURT:  And both of your sons are in the army;

5    is that right?

6              THE PROSPECTIVE JUROR:  Yes, my son, two sons.

7              THE COURT:  Thank you very much for that.

8              Any positive or negative impressions of the military

9    that you formed, based on your sons' service?

10             THE PROSPECTIVE JUROR:  Not really.

11             THE COURT:  Now, you didn't answer the questions

12   asking you what publicly known person you most admire and

13   least admire.  Is there anyone you can think of that you

14   admire very much or don't admire very much?

15             THE PROSPECTIVE JUROR:  I really don't have no one.

16             THE COURT:  No?  Okay.  You also you didn't answer

17   the question about would others describe you as openminded and

18   willing to listen and to assess different viewpoints.  So for

19   example, if I were to ask your sons or your daughter, is your

20   mother openminded, what would they say?

21             THE PROSPECTIVE JUROR:  I really don't know.

22             THE COURT:  Well, if they said you were closed

23   minded, would you disagree with them?

24             THE PROSPECTIVE JUROR:  No.

25             THE COURT:  Okay.  Do you have a problem to -- in

1  listening to other viewpoints that might be different than

2  yours?

3           THE PROSPECTIVE JUROR:  No.

4           THE COURT:  No problem?

5           THE PROSPECTIVE JUROR:  No problem.

6           THE COURT:  And you noted that you followed politics

7  somewhat closely.  You followed the 2016 presidential election

8  somewhat closely.  You followed news about President Trump

9  somewhat closely.  Have you formed any views based on the way

10  you follow the news about the prior Trump Administration or

11  any of the members of that administration, including the

12  President?

13           THE PROSPECTIVE JUROR:  Okay.  I disagree with many

14  things, but I don't want to say.

15           THE COURT:  You don't want to talk about it.  Well,

16  let me ask you some more specific questions.  First of all,

17  it's okay.  If you have some strong feelings one way or other,

18  you don't have to worry about saying them.  You're not going

19  to get in any trouble.  Everybody who is talking when they

20  have strong feelings, they're telling us.  It's kind of

21  important that we should know.

22           So let me put it this way:  It's possible in this

23  case that maybe President Trump, maybe some former members of

24  his administration might be witnesses in this case.  Would you

25  be able to set aside any opinions you might have of them,

1    whether they are good opinions or bad opinions, and evaluate

2    their testimony the same way you would any other witness?

3            THE PROSPECTIVE JUROR:  Yes.

4            THE COURT:  You sure of that?  Your feelings would

5    not get in the way?

6            THE PROSPECTIVE JUROR:  Yes.

7            THE COURT:  You laugh because you're thinking you

8    have strong feelings?

9            THE PROSPECTIVE JUROR:  Yeah.

10           THE COURT:  But are you completely confident that

11   those feelings would not enter in to your consideration of the

12   evidence in this case?

13           THE PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Any follow-up?

15           MR. JACKSON:  Please.  Buenos dias.  Let me just ask

16   you, ma'am:  I noticed that you checked for how well you

17   understand spoken English you checked not very well on your

18   questionnaire.  Am I right that you understand conversational

19   English well, but when things get more complicated or more

20   nuanced, you may have some difficulties?

21           THE PROSPECTIVE JUROR:  Yes, when it's more

22   complicated, sometime I don't know how to explain, yes.

23           MR. JACKSON:  And do you ever have some difficulties

24   when things get complicated in terms of comprehending exactly

25   what's being said?

1          THE PROSPECTIVE JUROR:  Yes.

2          MR. JACKSON:  Can I also ask you -- actually, I

3     think that's all my questions.  Thank you very much, ma'am.

4          MR. LOWELL:  And that was the question I was going

5     to asked based on her answer.

6          THE COURT:  Thank you.

7          All right, ma'am, if you'll just wait for us in the

8     hall.

9          MR. HARRIS:  Your Honor?

10          THE COURT:  Wait.  You have stuff too?

11          MR. HEEREN:  I'm sorry.  I understand you work in

12     human resources; is that right?

13          THE PROSPECTIVE JUROR:  Yes.

14          MR. HEEREN:  And does that involve -- do you work

15     with other people?

16          THE PROSPECTIVE JUROR:  No.

17          MR. HEEREN:  No.  What do you do at human resources?

18          THE PROSPECTIVE JUROR:  I process cases.

19          MR. HEEREN:  And does that involve paperwork?

20          THE PROSPECTIVE JUROR:  Yes.

21          MR. HEEREN:  Is that paperwork in English?

22          THE PROSPECTIVE JUROR:  Yes.

23          MR. HEEREN:  Do you have any issues doing your job

24     in reviewing that paperwork?

25          THE PROSPECTIVE JUROR:  No.

1    MR. HEEREN:  Thank you so much.

2    THE COURT:  Thank you.  Wait for us right back

3 there.  It will just be a few minutes.

4    THE PROSPECTIVE JUROR:  Okay, thanks.

5    (Prospective Juror exits the courtroom.)

6    MR. JACKSON:  We have two issues, Judge.  First, I

7 think the case is going to proceed more slowly than the

8 government says unfortunately because there's two defendants

9 with cross, I have no confidence we're going to be finished by

10 the time she needs to go to this.  And it's not the kind of

11 thing that a juror is going to want to miss, her daughter's

12 surgery.

13    Second, it's a real problem in this case, we're

14 very -- our entire case is about the nuance of spoken words.

15 There's going to be testimony that is getting very nuanced

16 about what was communicated, what was meant, and that's going

17 to be the entire fight in the case.  I think for a juror who

18 says that that's exactly what they have trouble with, even

19 those she's able to comprehend written English very well and

20 she can understand some basic conversational, she's just not

21 an appropriate juror for this case.

22    MR. HARRIS:  Your Honor, may I respond?

23    THE COURT:  Please.

24    MR. HARRIS:  I think we've already let jurors on the

25 venire who have events in November, including I think the

1   juror number 80 has a wedding on November 15, so the exact

2   same weekend this juror has a conflict.

3           I understand that defense counsel thinks the case is

4   going to proceed a little more slowly than the government.  It

5   would have to proceed double the length that the government's

6   anticipating.  The government anticipates it's going to rest

7   its case in early to mid-November -- I'm sorry, early to

8   mid-October.

9           THE COURT:  Talk to me about language.

10          MR. HARRIS:  Exactly, your Honor.  I think we all

11  listened to this juror speak.  I think she spoke very clearly,

12  very comfortably with English.  She understood your questions.

13  There was no comprehension difficulties there.

14          This questionnaire, I know it's in written English

15  rather than spoken English, but there's a lot of complicated

16  concepts.  She was able to complete it just fine.  I think

17  your Honor was talking earlier about some of the phrasing of

18  the legal principle questions, and she was nonetheless able to

19  read and comprehend them perfectly well.  If the juror had

20  said at some point I don't understand what you're asking me, I

21  think I would agree with Mr. Jackson, but I didn't -- yes,

22  and, of course, she works in English.  I didn't see anything

23  that gave me pause.

24          MR. LOWELL:  Judge, I have a comment to make as

25  you're thinking about this, please.  Two things.  Her

1  standing -- sorry, her sitting next to all of us, and have the

2  ability to ask her repeatedly, I don't mean that it was three

3  or four times, the need to rephrase for her to be able to

4  understand is one thing.  It's not the way it works at trial.

5  It's a person far away in a jury box, even with amplification,

6  and it goes fast, and the ability is not to ask a question

7  again or to ask to rephrase it unless one of the lawyers asks,

8  jurors don't usually get the chance to do that.  That was the

9  concern I was going raise when I wanted to ask her about her

10  language skills.  Because as Mr. Jackson said, there's a lot

11  going to happen that's orally important for somebody to

12  understand.

13         The other thing I would just point out, I never got

14  satisfied, even though you were trying to make her, every time

15  she chuckled when she talked about having these strong

16  feelings, that she didn't want to articulate, but every single

17  time she had that expression and laughed about it.  That's

18  disturbing.  In combination of those two things, it's a risk

19  we should not take.

20         THE COURT:  Okay.  I'm going to excuse her.  I'm not

21  worried about the scheduling, but I do think this process when

22  I'm trying to ask questions as simply as possible is not

23  parallel to what goes on at trial.  I'm as concerned about her

24  ability to communicate with other jurors in deliberations

25  because I did not think the communication outwardly towards me

1  was very good, as I am about her ability to understand, but I

2  think in the rapid fire of trial, there's a some undue risk

3  that she's not -- she's going to miss a lot.  So I'm going to

4  grant the motion to excuse for cause.

5          MR. HARRIS:  Your Honor, are we breaking?

6          THE COURT:  We're breaking, yes.  Let's come back at

7  about five to 12.

8          (Prospective Juror was excused.)

9          (Recess.)

10          (In open court.)

11          THE COURT:  Juror 186, Carol Sebok.

12          (Prospective Juror enters the courtroom.)

13          THE PROSPECTIVE JUROR:  Job interview.

14          THE COURT:  No, for a job interview, you could

15  actually if you win you get paid.

16          THE PROSPECTIVE JUROR:  Oh.

17          THE COURT:  How are you Ms. Sebok, are you good?

18          THE PROSPECTIVE JUROR:  Yes.  Fine.

19          THE COURT:  Let me start by asking you if there's

20  anything happening with you in the next four or five weeks

21  that would stop you from spending that time with us?

22          THE PROSPECTIVE JUROR:  No, just Rosh Hashanah, Yom

23  Kippur, the Jewish holidays.

24          THE COURT:  Any other Jewish holidays besides Rosh

25  Hashanah and Yom Kippur that you observe?

1    THE PROSPECTIVE JUROR:  No.  Those are the big ones
2    I celebrate.
3    THE COURT:  Let me ask you some follow-up questions
4    on just a few of the things you had on your questionnaire.
5    You mentioned that you lost your hearing in your right ear?
6    THE PROSPECTIVE JUROR:  This ear.
7    THE COURT:  I see you're leaning towards me to your
8    left.
9    THE PROSPECTIVE JUROR:  Correct.
10    THE COURT:  Do you have any concern at all that you
11    might not be able to hear the testimony?
12    THE PROSPECTIVE JUROR:  That why I said if you have
13    like headphone or something, or closed captioning.  I saw
14    screens in there also.
15    THE COURT:  Yeah, we're not that sophisticated.  The
16    screens are for --
17    THE PROSPECTIVE JUROR:  Yeah, headphones --
18    THE COURT:  -- the display.
19    THE PROSPECTIVE JUROR:  -- I could hear because I
20    usually listen on my left ear.  That's why I tilt my head this
21    way.  But I'm hearing everything you're telling me.
22    THE COURT:  It would be a little further at trial.
23    It won't be this easy.
24    THE PROSPECTIVE JUROR:  Okay.
25    THE COURT:  I don't know about headphones.  I've

1    never seen that done.  It's possible though.  I think our

2    system can accommodate that.  I'll have to look into that, but

3    let's assume, for example, you're seated in that last corner

4    seat up there.

5              THE PROSPECTIVE JUROR:  Uh-huh.

6              THE COURT:  And there's a witness who is seated --

7              THE PROSPECTIVE JUROR:  Okay.

8              THE COURT:  -- there.

9              THE PROSPECTIVE JUROR:  I would probably be edging

10   this way more to listen.

11             THE COURT:  Okay.  But if you edged that way, do you

12   think you could -- of course, everyone's got a microphone.

13   It's not as if --

14             THE PROSPECTIVE JUROR:  If you weren't speaking on a

15   microphone, I probably would have a hard time.  I'll be

16   honest, but with a microphone, it should be fine.

17             THE COURT:  You don't wear a hearing aid for it?

18             THE PROSPECTIVE JUROR:  No.  I don't make that much

19   money to afford one.

20             THE COURT:  Actually, now they're going to get

21   cheaper.

22             THE PROSPECTIVE JUROR:  They're coming out with them

23   over the counter.

24             THE COURT:  Okay.  Next, let me ask you the person

25   that you most admire is Ruth Ginsburg?

JURY SELECTION

1    THE PROSPECTIVE JUROR:  Yes.

2    THE COURT:  Honest person, fought hard for women.

3  The person you least admire is Donald Trump.  I can't really

4  read what you said.

5    THE PROSPECTIVE JUROR:  I gave you a list of people.

6    THE COURT:  Fake person, he steals from the state by

7  not filing truthful tax returns.  Okay.  Got that.

8    Now, you know, this case will involve testimony by

9  former officials of the Trump Administration.  It might even

10  involve testimony of the former President himself, and what I

11  have to know from you is that if you sit on this jury, can you

12  put aside any --

13    THE PROSPECTIVE JUROR:  Feelings?

14    THE COURT:  Yes.

15    THE PROSPECTIVE JUROR:  Yes.  I tend to -- I work in

16  payroll HR, and everybody comes down, he said this, she did

17  that, or whatever.  You have to listen -- there's a little

18  truth in both sides.  So you have to sit there and try and

19  analyze it yourself, you know.  I'm not going to -- just

20  because I didn't like what he's done, I still will listen to

21  him and I will give my, you know, honest opinion.

22    THE COURT:  You wouldn't say, oh, he's on the stand,

23  that's two strikes against him --

24    THE PROSPECTIVE JUROR:  No.

25    THE COURT:  -- I'm not going to believe anything he

1    says?

2          THE PROSPECTIVE JUROR:  He's still a person.  I

3    still have to listen to him, hear what he has to say.  Maybe

4    he had a good reason for whatever, you know, whoever it was

5    did.

6          THE COURT:  Okay.  And you followed the 2016

7    election and news about the former President somewhat closely.

8    And I guess that's what your opinions are as to least admired

9    and most admired are in part are based on, right?

10         THE PROSPECTIVE JUROR:  I followed it.  I don't like

11   so much political talk.  That's why I followed to a point, and

12   I stopped.  There's too much political out there.  It's --

13   that's why I don't follow it so closely.

14         THE COURT:  Right, I understand completely.

15         THE PROSPECTIVE JUROR:  I was a raised in a

16   democratic household, but I claim independent.  I don't choose

17   either side.

18         THE COURT:  So I just want to make absolutely sure

19   that you wouldn't hold it against the former President or

20   any --

21         THE PROSPECTIVE JUROR:  No.

22         THE COURT:  -- member of the administration?

23         THE PROSPECTIVE JUROR:  I wouldn't hold it against

24   any of them, no.

25         THE COURT:  You'd evaluate their testimony just like

1  any other witness?

2          THE PROSPECTIVE JUROR:  I'd like to hear their

3  testimony and make my own decisions.

4          THE COURT:  All right.  Anything further from the

5  parties?

6          MR. HARRIS:  No, your Honor.

7          MR. SCHACTER:  Yes, your Honor.  Hi.

8          THE PROSPECTIVE JUROR:  Hi.

9          MR. SCHACTER:  Good afternoon.

10          THE PROSPECTIVE JUROR:  Good afternoon.

11          MR. SCHACTER:  You, in describing your feelings

12  about President Trump, you referred to him as fake person.  He

13  steals from the state by not filing truthful tax returns.  Can

14  you just explain when you said, you're understanding about him

15  not filing truthful tax returns, can you explain what you mean

16  by that?

17          THE PROSPECTIVE JUROR:  He wouldn't give them -- if

18  you had nothing to hide, why can't you show them to everybody.

19  My dad was a retired auditor-accountants, you know, you make

20  mistakes or whatever.  Something wasn't filed correctly, be

21  honest about it and show it.  By not showing it, trying --

22  telling me that you're trying to hide something.

23          MR. SCHACTER:  And so by not -- and then by not

24  showing it, you're -- can you draw the line from that to the

25  not truthful tax returns?

1          THE PROSPECTIVE JUROR:  Uh-huh.  From what's the

2     in-between?

3          MR. SCHACTER:  From the not showing the tax returns.

4          THE PROSPECTIVE JUROR:  Right, it means --

5          MR. SCHACTER:  From that you conclude that the not

6     truthful tax returns, can you just draw that line?

7          THE PROSPECTIVE JUROR:  Right, to be -- it's like

8     you say, you listen to the testimony, tell me -- it can't be

9     truthful to me because you're not willing to show it.  Or

10    you're willing to talk about it and say what exactly what it

11    was that I can make my own decision if -- okay, maybe you

12    didn't hide anything, I'm wrong.  I can be wrong, but if

13    you're not going to try and prove it to me, or give me

14    evidence that will turn me around from feeling that way, I am

15    going to believe that you're hiding something, and that it's

16    not truthful.

17         THE COURT:  Let me ask you one more question that

18    what you just said triggered for me.  You know, in a criminal

19    case like this, the defendants have no obligation to do

20    anything.  They don't have to testify.  They don't have a call

21    witnesses.  It's the government's burden to prove them guilty

22    beyond a reasonable doubt.

23         THE PROSPECTIVE JUROR:  Okay.

24         THE COURT:  And one of the instructions that I

25    always give to jurors at the end of the case is that if the

1 defendants don't testify, as I say to them, you cannot hold

2 that against them in any way because they don't have to give

3 anything at all.  And, in fact, you can't even mention in the

4 jury room that they didn't testify because it's irrelevant.

5 It's all on the government to prove them guilty beyond a

6 reasonable doubt.  Would you have any difficulty following

7 that instruction?

8 　　　　　　　THE PROSPECTIVE JUROR:  No.  Um, I guess not.  I

9 would have to go because we're not like England.  We're the

10 U.S.  Like you said, we're innocent until proven, and in

11 England, it's guilty until proven innocent.  It's the

12 opposite.  So I'd have to -- you're giving those instructions,

13 and that's what I have to look at.

14 　　　　　　　THE COURT:  Okay.

15 　　　　　　　THE PROSPECTIVE JUROR:  Trump was my own personal

16 opinion.

17 　　　　　　　THE COURT:  I understand.  I understand.

18 　　　　　　　THE PROSPECTIVE JUROR:  But, yeah, for a case like

19 this, if that's what you're saying, if they are not giving

20 testimony, then that's what I have --

21 　　　　　　　THE COURT:  It absolutely doesn't matter, you can't

22 consider that --

23 　　　　　　　THE PROSPECTIVE JUROR:  Yes.

24 　　　　　　　THE COURT:  -- at all.  I'm not saying they won't, I

25 mean, we don't know, but the fact is, if they choose not to,

1   you can't hold it against them in any way.

2         THE PROSPECTIVE JUROR:  It would be up to the

3   government, as you said, to prove to me that yes, they are

4   guilty of what they did, otherwise if they can't prove it to

5   me then they're not guilty, they're innocent.

6         THE COURT:  Anything else?

7         MR. HARRIS:  Just one follow up.  I just want to

8   make sure that you're a hundred percent confident that you

9   would not hold it against the defense in any way that they did

10   not put on any evidence or have any witnesses and hold the

11   government to its burden.  Are you a hundred percent

12   confident --

13         THE PROSPECTIVE JUROR:  I'm a hundred percent --

14         MR. HARRIS:  -- you can do that?

15         THE PROSPECTIVE JUROR:  -- you can ask my husband

16   that one, because he'll -- when it comes to somebody, anybody

17   when I start to compare him or myself or saying, well, you

18   don't know both sides of it, maybe something else happened

19   that caused our neighbor next door not for doing a home

20   repairs, maybe he can't afford it, you don't know.  All his

21   response is, you're always sticking up for somebody, aren't

22   you?  I said, no, but you don't know both sides, you don't.

23   So unless you do, don't make an opinion.

24         THE COURT:  Okay.

25         THE PROSPECTIVE JUROR:  I guess I shouldn't either,

1   huh?

2           MR. LOWELL:  My follow up is similar, but slightly

3   different because you knew something about the U.K. system and

4   you said it was different.  Which is better, theirs or ours?

5           THE PROSPECTIVE JUROR:  I guess the innocent.

6   Because there's a lot of people who are innocent and unless

7   you've got somebody great on your side to prove that you're

8   not, you're going to end up in jail or whatever.  You know, it

9   would be, you know, the findings.

10          MR. LOWELL:  So in your view the U.S. system is

11  better --

12          THE PROSPECTIVE JUROR:  I like the U.S. system

13  better than the U.K. system, yes.  I like the innocent first.

14  And you have to prove it versus automatically -- look, back in

15  the 30s or even the 1800s, if a husband wanted to get rid of

16  his wife, he could say she's a little nutso, put her in the

17  funny home, you know, and put her away and they believe her,

18  she's guilty, innocence, but maybe she's not, he just wanted

19  to get rid of her.  Here you're saying I'm innocent, prove me

20  guilty, that's why I like, you know, it better.

21          MR. LOWELL:  Thank you.

22          THE PROSPECTIVE JUROR:  Okay.

23          THE COURT:  All right.  Thank you, ma'am.  If you

24  just wait out there in the hall --

25          THE PROSPECTIVE JUROR:  That way.

1      THE COURT:  -- just a minute.  We'll be right back

2  to you.

3      (Prospective Juror exits the courtroom.)

4      THE COURT:  Any challenges?

5      MR. SCHACHTER:  Yes, your Honor, we would challenge

6  her for cause.  The difference here with this juror than some

7  of the other ones would seem is that this is not a political

8  view, this is a view that he committed a crime that goes

9  directly to credibility.  That she already has a preconceived

10  notion that, in her words, he steals from the state by not

11  filing truthful tax returns, the proof of which is that he

12  didn't provide the tax returns, so effectively we're

13  introducing impeachment evidence without -- that the Court

14  would not permit.  And it goes beyond just the political

15  issues in this case are problematic enough, to take it one

16  step further to invade a credibility issue is also an issue.

17  That combined with the -- I understand where we got at the end

18  on presumption of innocence, it was very much news to the

19  juror, she actually seemed surprised to hear about it and that

20  when first asked whether she could follow that, her response

21  was not of course, her response was, I guess not.  That it

22  wouldn't hold it against them.  That combination we think

23  creates a juror that we don't think is qualified to sit.

24      MR. HARRIS:  Your Honor, I asked her directly is she

25  a hundred percent confident, not 99 to 1, I asked if she was a

1  hundred percent confident and she was pretty emphatic once you

2  had instructed her on the law.  If you're going to have to

3  instruct all these jurors on the law, you know, some of these

4  legal principles are not necessarily intuitive in the

5  questionnaire that the indictment is not evidence, that the

6  testimony of a single witness is sufficient, that -- the

7  others that are listed in there.  You're going to have to

8  educate these jurors and she was educated and she responded

9  emphatically when I asked the question.

10           I understand Mr. Schachter also had concerns about

11  the opinions she might have as to former President Trump.  I

12  think that if we were to bring her back and advise her that

13  again with respect to President Trump, to the extent she has

14  an opinion on any crimes he may have committed, there is a

15  presumption of innocence that accords to him as well and I

16  think that she would answer favorably there.

17           THE COURT:  I'm going to overrule the challenge.  I

18  really have no doubt about this juror.  I think she doesn't

19  know a lot about the law, but I think she is thoroughly

20  educatable and I think even in this short exchange she started

21  to is appreciate the importance of the presumption of

22  innocence and liked it and went with it and she will listen to

23  me when I tell her what the law is.

24           So I'm going to overrule it.

25           MR. SCHACHTER:  Yes, your Honor.

1          THE COURT:  Next is Juror 187, Eucharia Achi.

2          (Prospective Juror enters the courtroom.)

3          THE COURT:  Ms. Ash, is that how you pronounce it?

4          THE PROSPECTIVE JUROR:  Achi.

5          THE COURT:  Achi, how do you do, ma'am?

6          THE PROSPECTIVE JUROR:  I'm good.

7          THE COURT:  The first question I want to ask you, is

8    there anything happening with you in the next four or five

9    weeks that would make it difficult or impossible for you to

10   stay with us for trial?

11         THE PROSPECTIVE JUROR:  Yes, because here I'm coming

12   from -- it's far.  I'm coming from Queens and the

13   transportation this morning I took Uber and they took

14   50-dollar from my account.  So I believe that is too expensive

15   for me.

16         THE COURT:  What about public transportation?

17         THE PROSPECTIVE JUROR:  Because I'm not living in

18   Brooklyn, I don't know this area.

19         THE COURT:  We can give you directions.  We can do

20   Google Maps for you.  Okay.  You know, Queens it's -- I'm not

21   saying it's near, but it's not nearly as far as some people

22   come to serve on our juries here.

23         Anything else, any appointments or plans you have

24   that can't be changed?

25         THE PROSPECTIVE JUROR:  No.

1      THE COURT:  Let me ask you a few questions about the

2  answers you gave in your questionnaire.

3      First, you mentioned that religion is very important

4  in your life, and that's good, but I wanted to ask you if I

5  give you instructions on the law, you know, you have to do

6  this because this is the law at the end of the case, and would

7  you think, well, the Bible says something differently so I

8  can't follow the judge's direction?

9      THE PROSPECTIVE JUROR:  Um.

10     THE COURT:  Could you put that aside and say I've

11 got to follow the judge's reaction because I'm here in

12 Court -- I'm sorry I have to follow the Judge's instruction

13 because I'm here in Court?

14     THE PROSPECTIVE JUROR:  Actually, I have to do what

15 the Bible says and it is true that Judge said that you have to

16 do this, but I have to think I remember what God says in the

17 Bible, you have to do this.  So I believe I have to follow the

18 God's judgment instead of following the judge, what the judge

19 said.

20     THE COURT:  So if I were to give you an instruction

21 that you thought was different than what the Bible says, then

22 you think you'd have to go with the Bible.

23     THE PROSPECTIVE JUROR:  But, first of all, I have

24 to, you know, see that and think what the judge said whether

25 that is favor for me, if it is favor me I would think I have

1  to.  I think I believe I will follow it, but if I think that

2  what the judge said that does not favor me and I have to

3  follow the Bible because I want to answer to God.

4        THE COURT:  Let me ask you a couple of other

5  questions.  First, there was some things on the questionnaire

6  that you didn't answer.  I want to ask you about those.

7        We asked you if a family member had ever been

8  stopped or questioned by the police or by any law enforcement

9  agency.  Anything other than a traffic ticket, have you ever

10  had any family members with encounters with the law or

11  yourself?

12        THE PROSPECTIVE JUROR:  Like my husband, yes, my

13  husband he drives a cab and he have gotten in the traffic law.

14  I tell him, you have to obey the law go and pay the penalty,

15  so he would do that.

16        THE COURT:  Other than the traffic ticket, have you

17  or your husband had any encounters with the law?

18        THE PROSPECTIVE JUROR:  No.

19        THE COURT:  No, nothing.  Okay.  And then we asked

20  you what publicly known person you most admire and why, and

21  you left that blank.  Is there anyone in public life that you

22  think highly of?

23        THE PROSPECTIVE JUROR:  Come again please.

24        THE COURT:  Yes.  The question was:  What publicly

25  known person do you most admire, so that is some person in the

1  public that you think that is a fine person.  Is there anyone

2  like that?

3          THE PROSPECTIVE JUROR:  Fine person, like what

4  please.  I didn't get this question.

5          THE COURT:  Someone you look up to, someone you

6  think is an admirable person.

7          THE PROSPECTIVE JUROR:  Any person in the world?

8          THE COURT:  Any person in the world living or dead.

9          THE PROSPECTIVE JUROR:  I didn't get the question.

10  Please, can you come again.

11          THE COURT:  The question is, what publicly known

12  person do you most admire and why?

13          THE PROSPECTIVE JUROR:  I don't have -- I don't have

14  answer for that.

15          THE COURT:  Do you understand the question?

16          THE PROSPECTIVE JUROR:  I didn't get it.

17          THE COURT:  Okay.  Anything further?

18          MR. HARRIS:  No, your Honor.

19          MR. JACKSON:  No, your Honor.

20          THE COURT:  Thank you, ma'am.  If you wait for us

21  outside there a moment, we'll be right with you.

22          (Prospective Juror exits the courtroom.)

23          THE COURT:  We all agree that's a language issue.

24          MR. JACKSON:  Yes, your Honor.

25          MR. HARRIS:  Yes.

1          THE COURT:  Okay.

2          This is Juror 195, Ernest Christian.

3          MR. LOWELL:  I think it's somebody else on question

4    10 on language may have put something down about not very

5    well, so we'll find out I suspect.

6          THE COURT:  Yes.  Okay.

7          (Prospective Juror enters the courtroom.)

8          THE COURT:  Mr. Christian, how are you?

9          THE PROSPECTIVE JUROR:  Yes, I'm good today.

10         THE COURT:  Okay.  Good.  The first thing I need to

11   ask you is, is there any reason that you can't spend the next

12   four or five weeks with us here?  Do you have any conflicts in

13   your schedule?

14         THE PROSPECTIVE JUROR:  No, sir, because my job and

15   I take care of my father also.  He is 88 years old.

16         THE COURT:  So you're saying it would be difficult

17   for you to come here because you --

18         THE PROSPECTIVE JUROR:  Yeah, yeah, very difficult.

19         THE COURT:  And what is it about your job that you

20   can't take off?

21         THE PROSPECTIVE JUROR:  Yeah, my job in the

22   (inaudible) I take them and escort them, go with this

23   everywhere and transporting and come back and then after I go

24   home I take care my father.

25         THE COURT:  Okay.  Anything further?

1          MR. HARRIS:  No, your Honor.

2          MR. JACKSON:  No, your Honor.

3          THE COURT:  Please step out in the hall, we'll be

4   with you in just one moment.

5          THE PROSPECTIVE JUROR:  Yes.  Thank you.

6          THE COURT:  Right back there.

7          (Prospective Juror exits the courtroom.)

8          THE COURT:  Okay.  Also language, right?

9          MR. HARRIS:  Yes.

10          MR. JACKSON:  Yes, your Honor.

11          THE COURT:  He's excused.

12          (Prospective Juror was excused.)

13          THE COURT:  This is Juror 196 Salvatore Saputo.

14          (Prospective Juror enters the courtroom.)

15          THE COURT:  Mr. Saputo, how are you.

16          THE PROSPECTIVE JUROR:  Good.  How are you?  Thank

17   you.

18          THE COURT:  The first question I need to ask you is,

19   is there anything happening in your life over the next four or

20   five weeks that would make it difficult or impossible for you

21   to spend that time with us?

22          THE PROSPECTIVE JUROR:  Next week I'm going away on

23   a trip to Disney with my family, with my wife and my daughter.

24          THE COURT:  That's nice.

25          THE PROSPECTIVE JUROR:  And I have the invoice to

1    prove if you want.

2            THE COURT:  No, I can tell you're telling me the

3    truth.  Okay.

4            THE PROSPECTIVE JUROR:  I mean, if the case starts

5    after I come back, I have no problem.  And if I get chosen, I

6    have no problem serving.

7            THE COURT:  When you gone exactly?

8            THE PROSPECTIVE JUROR:  I'm leaving the 26th and I'm

9    coming back October 1st.  Let me just double check that.  Yes,

10   October 1st.

11           THE COURT:  Okay.  I need to ask you, is there any

12   way you could postpone that trip?

13           THE PROSPECTIVE JUROR:  If I have to and you don't

14   give me any other choice, then I mean I'll leave the decision

15   I guess to you guys.  I mean, if I have to.  I have the travel

16   insurance that I could do if I had to.  Do I want to and

17   disappoint my 11-year-old daughter, probably not, but if it's

18   something that I have to do, and I already told my wife there

19   might be a chance; she understands.

20           THE COURT:  Do I need to ask further questions?

21           MR. HARRIS:  No, your Honor.

22           MR. JACKSON:  Yes, your Honor.

23           THE COURT:  Let me just ask you a few things

24   Mr. Saputo about your questionnaire.

25           THE PROSPECTIVE JUROR:  Yes.

1          THE COURT:  You said that religion is very important

2    in your life.

3          THE PROSPECTIVE JUROR:  Yes.

4          THE COURT:  On the off-chance, and I don't think

5    this is likely, but let's suppose that when I give you the

6    instructions on the law that I would give in this case, you

7    found in your view something in those instructions that was

8    inconsistent with your religious feelings, could you put aside

9    your religious feelings and follow the law as I instruct you?

10          THE PROSPECTIVE JUROR:  Absolutely, yes.

11          THE COURT:  And your wife was in the army, got an

12    honorable discharge?

13          THE PROSPECTIVE JUROR:  Yes.

14          THE COURT:  What did she do?

15          THE PROSPECTIVE JUROR:  She had stomach issues.

16          THE COURT:  No, I mean what did she do while she was

17    in the army?

18          THE PROSPECTIVE JUROR:  She was in basic training.

19          THE COURT:  She was discharged in basic training?

20          THE PROSPECTIVE JUROR:  Yes.

21          THE COURT:  I see.  You read the news every day or

22    you follow the news every day?

23          THE PROSPECTIVE JUROR:  Correct.

24          THE COURT:  Have you formed any strong political

25    views based on what you've read or learned?

1          THE PROSPECTIVE JUROR:  No.

2          THE COURT:  No.  Okay.  Okay.  Any follow up?

3          MR. HARRIS:  I have one, your Honor.

4          You mentioned that your most admired person was

5     former President Trump and your least admired person President

6     Biden.  Obviously you've read the summary of this case and you

7     saw the questions that some of the issues that may come up in

8     this case may relate to the Trump Administration and the Trump

9     campaign, members of the administration could testify or not

10    testify, theoretically it's possible the former president

11    could testify.

12          How would you view, for example, the former

13    president were to testify, his testimony versus say, President

14    Biden were to testify, would you be able to treat them both

15    equally.

16          THE PROSPECTIVE JUROR:  Absolutely, absolutely, yes.

17          THE COURT:  Anything else?

18          MR. JACKSON:  No, your Honor.  Thank you.

19          THE COURT:  All right.  If you wait for us in the

20    hall right there for just a moment, we'll be right back to

21    you.

22          THE PROSPECTIVE JUROR:  Thank you so much.  Thank

23    you everybody.

24          (Prospective Juror exits the courtroom.)

25          MR. LOWELL:  I'll talk to his 11 year old.

1          MR. JACKSON:  Yes, Judge, at the end of the day --

2          THE COURT:  Mr. Jackson, you don't have to explain

3     it, it's really not cause to disappoint an 11 year old.  I'll

4     say you're a pretty tough man, you know.  I think the rest of

5     us probably would have gone along and let her have the

6     vacation, but it's not cause.  I'm going to keep him in.

7     He's, otherwise, a wonderful juror.

8               (Prospective Juror enters the courtroom.)

9          THE COURT:  This is juror number 202, Evelyn Rojas

10    Olivan.

11         THE COURT:  Please have a seat.

12         THE PROSPECTIVE JUROR:  Thank you.

13         THE COURT:  Hello, Ms. Rojas Olivan.

14         THE PROSPECTIVE JUROR:  How are you?

15         THE COURT:  Am I pronouncing your name right?

16         THE PROSPECTIVE JUROR:  Olivan.

17         THE COURT:  First question I want you to is there

18    anything happening in your life over the next four or five

19    weeks that would make it difficult, and by difficult, I mean

20    impossible or nearly impossible for you to spend that time

21    with us?

22         THE PROSPECTIVE JUROR:  No.

23         THE COURT:  Your boyfriend works for the NYPD?

24         THE PROSPECTIVE JUROR:  Uh-huh.

25         THE COURT:  Is he a police officer?

1          THE PROSPECTIVE JUROR:  He is.

2          THE COURT:  Anything about his job that gives you

3     any favorable or unfavorable view of law enforcement?

4          THE PROSPECTIVE JUROR:  No.

5          THE COURT:  There are going to be some law

6     enforcement witnesses who testify in this case.

7          THE PROSPECTIVE JUROR:  Uh-huh.

8          THE COURT:  Could you evaluate their testimony just

9     like you would anybody else's testimony?

10         THE PROSPECTIVE JUROR:  Yes.

11         THE COURT:  We asked you the question what publicly

12    known person do you most admire and why and least admire and

13    why, and you said there's no one, which is okay, but I just

14    want to ask you, if you think about that more, is there anyone

15    who you really feel should be looked up and anyone you feel

16    should be looked down at?

17         THE PROSPECTIVE JUROR:  Like publicly?  No.

18         THE COURT:  Yeah, publically.  It could be a

19    politician.  It could be a sports figure.  It could be a

20    celebrity, anybody like that?

21         THE PROSPECTIVE JUROR:  No.

22         THE COURT:  I think I understand this answer, but I

23    just want to make sure.  Do you remember at the end of the

24    questionnaire there was this long attachment A with people's

25    names and some places on it?  Let me show it to you.  It will

1  refresh your recollection.  Remember this?

2              THE PROSPECTIVE JUROR:  Oh, yes.

3              THE COURT:  And you didn't say anything.  I just

4  wanted to make sure nothing on there is familiar to you?

5              THE PROSPECTIVE JUROR:  No, it's not.

6              THE COURT:  I also noticed that you followed the

7  2016 presidential election pretty closely, somewhat closely,

8  as well as news about former President Trump.  And I wanted to

9  ask you if you're following of those things has caused you to

10  form any strong opinions about them?

11              THE PROSPECTIVE JUROR:  No.

12              THE COURT:  No.  Okay.  Now, you did say that you

13  were possibly traveling.  I take it you've decided you can

14  wait til --

15              THE PROSPECTIVE JUROR:  I've traveled before.

16              THE COURT:  You did.

17              THE PROSPECTIVE JUROR:  Two weeks ago.

18              THE COURT:  Thank you.  Yes, the questionnaires can

19  get a little bit stale that way.  Any follow-up?

20              MR. JACKSON:  May I ask one question, your Honor?

21              THE COURT:  Please.

22              MR. JACKSON:  Good morning, ma'am.

23              THE PROSPECTIVE JUROR:  Good morning.

24              MR. JACKSON:  I noticed that you put on your

25  questionnaire when the questionnaire asked about news sources,

1    that you listen to podcasts.

2              THE PROSPECTIVE JUROR:  Uh-huh.

3              MR. JACKSON:  I just wondered, can you tell us some

4    of the podcasts you listen to?

5              THE PROSPECTIVE JUROR:  Nothing specific.  Like

6    clinical or -- I'm a registered nurse, so sometimes I like to

7    keep up on that.

8              MR. JACKSON:  Thank you so much.

9              THE PROSPECTIVE JUROR:  About that.

10             THE COURT:  All right.  Thank you, ma'am.  If you'll

11   just step out in the back there, we'll be with you in one

12   moment.

13             THE PROSPECTIVE JUROR:  Okay.

14             THE COURT:  Thanks.

15             (Prospective Juror exits the courtroom.)

16             THE COURT:  No challenges?

17             MR. HARRIS:  No, your Honor.

18             MR. JACKSON:  No, your Honor.

19             THE COURT:  We're keeping her, Quadri.

20             This is juror 210, Diane Gracia.

21             (Prospective Juror enters the courtroom.)

22             THE COURT:  Ms. Gracia, how are you?

23             THE PROSPECTIVE JUROR:  Good.

24             THE COURT:  Am I pronouncing your name, right?

25             THE PROSPECTIVE JUROR:  Gracia, yes.

1    THE COURT:  Tell me if there's anything happening

2  with you in the next four or five weeks that would make it

3  difficult or impossible for you to be here as a juror?

4    THE PROSPECTIVE JUROR:  No.

5    THE COURT:  No, nothing?  No job or family or

6  anything like that?

7    THE PROSPECTIVE JUROR:  Kids in college, so, yeah.

8    THE COURT:  That's good.  It's good to be an empty

9  nester and have your kids in college.  You didn't answer the

10  question as to whether you or any immediate family member had

11  ever served in the military?

12    THE PROSPECTIVE JUROR:  Oh no.

13    THE COURT:  You just skipped over it.  No one has?

14    THE PROSPECTIVE JUROR:  No, no one has.

15    THE COURT:  Okay.  Also you skipped over the

16  question as to whether you or a family member or a very close

17  friend had ever been a witness in court, or had sued anybody,

18  or had any experience with the judicial system.

19    THE PROSPECTIVE JUROR:  It was just an oversight,

20  no.

21    THE COURT:  They're all no?

22    THE PROSPECTIVE JUROR:  No.

23    THE COURT:  Okay.  And you also didn't answer

24  whether you've ever followed any trials closely on TV or the

25  internet.

1          THE PROSPECTIVE JUROR:  No.

2          THE COURT:  No, you don't do that?

3          THE PROSPECTIVE JUROR:  No.

4          THE COURT:  Okay.  What publicly known person do you

5    most admire and why, and you said C Harris?

6          THE PROSPECTIVE JUROR:  When the political campaign

7    on Staten Island, we were, someone was talking to me about it.

8    That was the only reason why that she was a good influencer,

9    yeah, basic.  That's the only person I could have thought of

10   at that moment.

11         THE COURT:  Okay.  You said there is no one who you

12   least admire.  No one in public life who you do not think well

13   of?

14         THE PROSPECTIVE JUROR:  I don't follow politics very

15   well, so.

16         THE COURT:  Okay.  That's fine.  Now, you said that

17   you followed the 2016 presidential election and news about

18   former President Trump.

19         THE PROSPECTIVE JUROR:  Uh-huh.

20         THE COURT:  You said somewhat closely.  Actually,

21   you said somewhat closely for the election.  You said not

22   closely at all for former President Trump.  Is there some

23   reason you try to stay away from news about former President

24   Trump?

25         THE PROSPECTIVE JUROR:  I'm a nurse, so basically

1    whatever we see when we're like in the break room, it's

2    only -- that's how we get -- I don't follow politics, so

3    that's where I was seeing it mostly when I was at work, not at

4    home.

5              THE COURT:  You weren't deliberately trying to avoid

6    news --

7              THE PROSPECTIVE JUROR:  No.

8              THE COURT:  -- about President Trump?

9              THE PROSPECTIVE JUROR:  No, no.

10              THE COURT:  Okay.  Any follow-up?

11              MR. HARRIS:  No, your Honor.

12              MR. JACKSON:  I just have one question, ma'am.  How

13    are you today?

14              THE PROSPECTIVE JUROR:  Great.

15              MR. JACKSON:  When you said C Harris, are you

16    referring to Kamala Harris?

17              THE PROSPECTIVE JUROR:  Yes.

18              MR. JACKSON:  Okay.  Thank you so much.

19              THE COURT:  All right.  Thank you, ma'am, if you'll

20    just wait out there for a moment, we'll be right with you.

21              THE PROSPECTIVE JUROR:  Thank you.

22              (Prospective Juror exits the courtroom.)

23              THE COURT:  Okay.  No challenges, right?

24              MR. HARRIS:  No, your Honor.

25              THE COURT:  Okay.  Who is C Harris?

1        MR. JACKSON:  Kamala Harris.  I think it was K.

2        (Continued on the next page.)

1            THE COURT:  Juror 214.  Megan Sover.

2            (Prospective juror enters.)

3            THE COURT:  How are you?

4            PROSPECTIVE JUROR:  I'm good.  How are you?

5            THE COURT:  Am I pronouncing your name, right?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  First thing is, is there anything

8    happening with you in the next four or five weeks that makes

9    it difficult or impossible to be a juror in this case?

10           PROSPECTIVE JUROR:  I don't think so.  I have a

11   wedding November 3rd that weekend.

12           THE COURT:  In town?

13           PROSPECTIVE JUROR:  In Chicago.

14           THE COURT:  We might be -- are we on the Friday the

15   before that, the November 2, I think?

16           MR. HARRIS:  Your Honor doesn't normally sit on

17   Friday.

18           MR. LOWELL:  We're not on trial that Friday.

19           THE COURT:  You could go on Friday, come back on

20   Sunday.  Would that work for you?

21           PROSPECTIVE JUROR:  Yes.

22           THE COURT:  Nothing else that would give you a

23   problem?

24           PROSPECTIVE JUROR:  No.

25           THE COURT:  I want to follow-up with you on some of

1 the answers that you gave to the questionnaire.  Your

2 boyfriend got in a little trouble at a college party and

3 someone called the police.  Am I correct to assume that won't

4 have any affect on your ability to serve as a juror in this

5 case?

6         PROSPECTIVE JUROR:  No.

7         THE COURT:  You follow the news pretty regularly,

8 right?

9         PROSPECTIVE JUROR:  It's more of the Today Show in

10 the morning.  I wouldn't say regularly, aside from that.

11         THE COURT:  Do you have any strong political

12 opinions or anything else you gain from the news?

13         PROSPECTIVE JUROR:  Not really, I don't think.

14         THE COURT:  You also said that former President

15 Trump is not your favorite person but I believe I can remain

16 impartial.  If he or some people from the former

17 administration were to testify in this case, could you view

18 their testimony the same way you would view anybody else's

19 testimony?

20         PROSPECTIVE JUROR:  Yes.  They are not the ones that

21 are on trial.  It's more they are giving their side.

22         THE COURT:  You said you believe you could remain

23 impartial.  Are you reasonably confident that you could?

24         PROSPECTIVE JUROR:  Yes, yes.

25         THE COURT:  That's all I have.

1            Any follow-up?

2            MR. HARRIS:  No, your Honor.

3            MR. JACKSON:  I know your degree is in theater

4    management, I wondered, does your theater management degree

5    has that been part of your professional work at all?

6            PROSPECTIVE JUROR:  I work for a theatral marketing

7    agency.  I worked on in the Broadway atmosphere here.

8            MR. JACKSON:  Are you working on particular shows?

9            PROSPECTIVE JUROR:  We're on Take Me Out, Phantom of

10   the Opera, Chicago, Hamilton, Moulan Rouge.  I think that's

11   all of them.  I'm more on the partners and promotions end of

12   that.

13           MR. JACKSON:  Can I ask what the name of the company

14   is.

15           PROSPECTIVE JUROR:  RPM.

16           MR. JACKSON:  Thank you so much.

17           THE COURT:  That causes me more questions, can you

18   get us all discount tickets?

19           PROSPECTIVE JUROR:  I can't get it sometimes.

20           MR. LOWELL:  Good afternoon.  So when you were

21   answering the questions about people who could be witnesses

22   that might have something to do with either the administration

23   or whatever, that's witnesses.  The people in the case may

24   have had something to do with that administration, that would

25   not stand in your way of judging people that are actually in

1  the trial objectively?

2        PROSPECTIVE JUROR:  No.  It's likely that I don't

3  know them if you were to put them front of me, I probably

4  other than the very obvious people.

5        THE COURT:  Thank you.  Wait for us in the hall and

6  we'll be right with you.

7        (Prospective juror exits.).

8        THE COURT:  Any challenges?

9        MR. HARRIS:  Your Honor.

10       MR. JACKSON:  No, your Honor.

11       THE COURT:  She's in.

12       This is juror number 220, Mikita Labanok.

13       (Prospective juror enters.)

14       THE COURT:  How are you?

15       PROSPECTIVE JUROR:  Very good.  How are you?

16       THE COURT:  Am I pronouncing your name, right.

17       PROSPECTIVE JUROR:  Yes.

18       THE COURT:  Tell me if there is anything happening

19  in your life over the next four to five weeks that might make

20  it difficult for you to be a juror in this case?

21       PROSPECTIVE JUROR:  Well, I have three kids.

22       THE COURT:  How old?

23       PROSPECTIVE JUROR:  Fourteen, 12, and six.

24       THE COURT:  First of all, congratulations.  Are you

25  married, I take it?

1    PROSPECTIVE JUROR:  Yes.  And I have to usually pick

2    them up from school, this kind of stuff.

3    THE COURT:  If you don't pick them up from school,

4    who will?

5    PROSPECTIVE JUROR:  My wife might.  It will be more

6    difficult for her.  I work from home, she works in Manhattan.

7    THE COURT:  Sounds like, although your wife would be

8    mad at me --

9    PROSPECTIVE JUROR:  She would.

10   THE COURT:  -- it can be done.

11   PROSPECTIVE JUROR:  Yes.

12   THE COURT:  I told everybody, everybody makes

13   sacrifices to do this, that might be one of them.  If your

14   wife gets mad at me, send her to me, I'll be glad to talk to

15   her.

16   PROSPECTIVE JUROR:  That would be helpful.

17   THE COURT:  I can give you a letter, whatever you

18   want.

19   You're a business owner, right?

20   PROSPECTIVE JUROR:  Yes, I am.

21   THE COURT:  What is the business, again, tell me?

22   PROSPECTIVE JUROR:  Software development.  We're

23   development virtual reality for education.

24   THE COURT:  How big a company?

25   PROSPECTIVE JUROR:  Not big, 12 people.

1    THE COURT:  Are there people to cover for you and do

2  software development while you're here?

3    PROSPECTIVE JUROR:  Yes.

4    THE COURT:  You were in the Belarus army before you

5  came here, right?

6    PROSPECTIVE JUROR:  I was compulsive service.

7    THE COURT:  I'm not holding it against you.  I know

8  it's compulsatory.

9    PROSPECTIVE JUROR:  Yes, I was Sergeant.

10    THE COURT:  You were a Sergeant.

11    PROSPECTIVE JUROR:  Yes, I was.

12    THE COURT:  How long have you been here?

13    PROSPECTIVE JUROR:  Since 2014 -- since 2004.

14    THE COURT:  I was going to say your English is

15  incredible.

16    What publicly known person do you most admire and

17  why.  You said Volodymyr Zelenskyy.  Very gutsy guy,

18  obviously.  And what publicly known person you least admire,

19  and why, and you said Putin, corruption and war crimes.

20    Anything you want to add to either one of those?

21  It's pretty obvious, I want to give you a chance.

22    PROSPECTIVE JUROR:  I think it's the function of

23  where I come from.  There is a literal war going on there.

24    THE COURT:  You don't generally follow crime stories

25  in the media.

1              PROSPECTIVE JUROR:  No.

2              THE COURT:  You follow politics somewhat closely.

3    Not very closely and not not closely at all.  Have you formed

4    any kind of strong political views?

5              PROSPECTIVE JUROR:  Depends on what.

6              THE COURT:  You tell me.  Anything that you feel

7    strongly about?  I have a feeling you feel strongly about the

8    Ukraine war.

9              PROSPECTIVE JUROR:  Probably that would be the case.

10             THE COURT:  Anything that rises to that level?

11             PROSPECTIVE JUROR:  Not really.

12             THE COURT:  That's all.  I have any follow-up?

13             MR. HARRIS:  No, your Honor.

14             MR. HEEREN:  One brief one.  Good afternoon.  I

15   understand you have very impressive educational background in

16   international business and finance and accounting and other

17   stuff.  Some of those issues may come up in this case.  Do you

18   understand, do you believe, that you would be able to put

19   aside any opinions or feelings you may have from your past

20   experience when you come into the courtroom and work on this

21   case?

22             PROSPECTIVE JUROR:  I can definitely try.  I don't

23   think there was any super strong opinion that was imposed

24   through education.  You understand crime is bad; crime is not

25   good.

1          THE COURT:  Anything else?

2          MR. JACKSON:  Not from us.  Thank you.

3          THE COURT:  Thank you.  Please step out in the hall.

4    We'll be right with you.

5          (Prospective juror exits.)

6          THE COURT:  No challenges.

7          MR. HARRIS:  No, your Honor.

8          MR. JACKSON:  No, your Honor.

9          THE COURT:  He's in.

10         Next is 221, Janice Veiga.

11         (Prospective juror enters.)

12         THE COURT:  How are you?

13         PROSPECTIVE JUROR:  Good.  How are you?

14         THE COURT:  First thing I need to ask you, is there

15   anything coming up in your life over the next four or five

16   weeks that would make it impossible for you to be a juror in

17   this case?

18         PROSPECTIVE JUROR:  Nothing coming up, just my

19   normal job.  I hate to be away from it for that long.

20         THE COURT:  It might help, there will be a few weeks

21   we're sitting not sitting five days and you'll be able to keep

22   up your job.  Other than that, there is nothing that would

23   stop you?

24         PROSPECTIVE JUROR:  No.  No travel, nothing.

25         THE COURT:  Let me ask a couple of follow-up

1  questions from your questionnaire that you filled out from us,

2  which probably took out good chunk out of your life.  Your

3  spouse is an ADA in Manhattan?

4          PROSPECTIVE JUROR:  He is.

5          THE COURT:  You have two brothers who are in the

6  NYPD.

7          PROSPECTIVE JUROR:  One is retired.

8          THE COURT:  So you've got people in law enforcement.

9          PROSPECTIVE JUROR:  Uh-huh.

10          THE COURT:  Have you formed any positive or negative

11  impressions of our criminal justice system based on their

12  work?

13          PROSPECTIVE JUROR:  No, not really.

14          THE COURT:  Your father was in the Navy?

15          PROSPECTIVE JUROR:  He was.

16          THE COURT:  Do you know what he did in the Navy?

17          PROSPECTIVE JUROR:  Not exactly sure.

18          THE COURT:  Do you know what his rank was?

19          PROSPECTIVE JUROR:  I don't know.

20          THE COURT:  We asked you what publicly known person

21  you most admire and why.  And what publicly known person you

22  least admire and why.  And you wrote N/A.

23          PROSPECTIVE JUROR:  I don't know.

24          THE COURT:  There is no one that comes to mind in

25  public life that is a really admirable person?

1          PROSPECTIVE JUROR:  I don't know.  I couldn't think

2    of it either way.

3          THE COURT:  You said that you follow the news almost

4    every day, not every day.

5          PROSPECTIVE JUROR:  I don't read a newspaper or

6    anything; we don't get the paper.

7          THE COURT:  Where do you get your news?

8          PROSPECTIVE JUROR:  Facebook, you know, social

9    media.  I do put on the TV once in a while.

10         THE COURT:  You said that you followed the 2016

11   Presidential election and news about former President Trump

12   somewhat closely.

13         PROSPECTIVE JUROR:  Somewhat, very little.

14         THE COURT:  Almost not closely.

15         PROSPECTIVE JUROR:  Almost not closely.  Enough to

16   vote.

17         THE COURT:  Have you formed any strong political

18   opinions --

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  -- about those things?

21         PROSPECTIVE JUROR:  Definitely not.

22         THE COURT:  I did want to ask you, because I don't

23   want to trap you or trick you, I note you did mention that

24   your elderly mother-in-law lives next door.

25         PROSPECTIVE JUROR:  Next door to me.

1          THE COURT:  We won't be trying the case every day of

2    the week.  You'll be able to check on her.  I think we stop

3    rigidly at 4:30 every day.  You'll be able to get back and

4    check on her.

5          PROSPECTIVE JUROR:  It's still a long day, but.

6          THE COURT:  It is.

7          Any additional questions?

8          MR. HARRIS:  No, your Honor.

9          MR. LOWELL:  No, your Honor.

10          THE COURT:  Thank you, ma'am.  Wait for us back

11    there for a moment.  We appreciate you coming in.

12          PROSPECTIVE JUROR:  Thank you.

13          (Prospective juror exits.)

14          THE COURT:  This is 222, Rebecca Lovaglio.

15          THE LAW CLERK:  Are we keeping that person?

16          THE COURT:  Yes.

17          (Prospective juror enters.)

18          THE COURT:  Good afternoon.  I want to make sure I'm

19    pronouncing your name correctly.  Is it a hard G or soft G?

20          PROSPECTIVE JUROR:  Either way.

21          THE COURT:  Tell me what you prefer.

22          PROSPECTIVE JUROR:  Lovaglio.

23          THE COURT:  Is there any reason over the next four

24    or five weeks, anything happening in your life, that would

25    make it impossible for you to be a juror in this case?

1        PROSPECTIVE JUROR:  No.

2        THE COURT:  Let me ask you a couple of questions

3   about the answers you gave on the lengthy questionnaire that

4   you filled out for us.  Someone close to you have been in law

5   enforcement or did you check no and then cross out?

6        PROSPECTIVE JUROR:  It was my former father-in-law.

7   I wasn't sure how to answer it.

8        THE COURT:  Do you still talk to him?

9        PROSPECTIVE JUROR:  No.

10       THE COURT:  Anything about his work in law

11  enforcement that caused you to form any kind of opinion about

12  law enforcement?

13       PROSPECTIVE JUROR:  No.  Him, but not law

14  enforcement.

15       THE COURT:  You didn't answer the question, I take

16  it's probably because the answer is no, as to whether you or a

17  family member or a very close friend had ever been involved in

18  any kind of criminal or civil litigation.

19       PROSPECTIVE JUROR:  No.  Sorry.

20       THE COURT:  That's okay.  I understand that your

21  daughter was the victim of a crime.  And the question I have

22  here, you don't need to get into the details about that, the

23  question I have for you is, were you satisfied or dissatisfied

24  with the police, response if there was a police response?

25       PROSPECTIVE JUROR:  She chose not to involve the

1  police.  She went through the school security administration

2  that she was at.  They did make accommodations.  There was

3  punishment for the perpetrator.  So I felt they did as much as

4  they could.  That was as far as she wanted to go with it.

5            THE COURT:  Got it.  You're the first person to say

6  this so far, and I'm surprised, that the person you most

7  admire was Queen Elizabeth.

8            PROSPECTIVE JUROR:  That was before she passed away.

9            THE COURT:  Maybe that's why everyone hasn't said

10  that.  What person do you least admire, you said most

11  celebrities and politicians.  Any particular politicians that

12  you least admire?

13            PROSPECTIVE JUROR:  No, I think, like, I don't think

14  I'm alone in this, many people in the country today are

15  disheartened by all of our leaders.  I can't say that more

16  about one than the other.  I don't have a specific party or --

17  I think referring back to who I most admire, I would like to

18  see more dignity here.

19            THE COURT:  I think you're right, a lot of people

20  share that opinion.

21            It's possible in this case that either former

22  President Trump or some members of his former administration

23  will be witnesses.  Would you have any difficulty in

24  evaluating their testimony the same way you would any other

25  witness?

1       PROSPECTIVE JUROR:  I wouldn't.  Like I said, my

2  feelings are not partisan or even necessarily directed at one

3  particular person.  I think I'm just disheartened in the

4  system overall.  But I don't have personal feelings one way or

5  the other regarding President Trump.

6       THE COURT:  Any additional questions?

7       MR. JACKSON:  May I ask one question, your Honor?

8       Good afternoon, ma'am.  I know you said that Queen

9  Elizabeth was your favorite person, I just wondered in brief

10  summary, tell us why.

11       PROSPECTIVE JUROR:  I think I said it on my

12  questionnaire.  I think -- I have children, I think there are

13  very few people that myself or my children can look up to that

14  carry themself dignified, noble, aside from her position.

15  Everything is not a selfie or social media.  Just a dignified

16  person.  I think that is obviously her commitment to service,

17  I find just amazing.  I think that I hope that answers your

18  question.

19       MR. JACKSON:  Yes.  Thank you so much.

20       THE COURT:  Thank you, ma'am.  If you wait in the

21  hall back there for a minute, we'll be right with you.

22       PROSPECTIVE JUROR:  Thank you.

23       (Prospective juror exits.)

24       THE COURT:  No challenges.  She's in.

25       This is 223, Wayne Galante.

1          (Prospective juror enters.)

2          THE COURT:  How are you?

3          PROSPECTIVE JUROR:  Good.  How are you?

4          THE COURT:  Okay.  Thank you for spending time with

5    us.  Thank you for filling out this massive questionnaire.

6          The first thing I wanted to ask is, is there

7    anything at all in your life happening over the next four or

8    five weeks that would make it difficult for you to be a juror

9    here?

10          PROSPECTIVE JUROR:  No.  You asked that in the --

11          THE COURT:  I did.

12          PROSPECTIVE JUROR:  No.  I just I go to work every

13   day.

14          THE COURT:  You can miss work?

15          PROSPECTIVE JUROR:  Yeah, it's a consulting

16   business.

17          THE COURT:  You can miss work or you can work

18   nights.  Also, we won't be sitting every day of the week,

19   you'll have time to catch up.

20          PROSPECTIVE JUROR:  My company is pretty agreeable

21   to people doing their jury duty.

22          THE COURT:  Is it a big consulting firm?

23          PROSPECTIVE JUROR:  Jacobs, it's one of the largest.

24          THE COURT:  I wanted to follow-up on a few of the

25   answers you gave in your questionnaire.  It seems you've been

1   a juror fairly frequently, you said three times or more.

2          PROSPECTIVE JUROR:  Not on federal, on city.

3          THE COURT:  That's what I was going to ask, city or

4   state?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  You live in kings?

7          PROSPECTIVE JUROR:  No, I live now in Queens County.

8   I was in kings.

9          THE COURT:  In state jury it has been on Septin

10   Boulevard?

11          PROSPECTIVE JUROR:  Yes, and the other were in Kings

12   County right here.

13          THE COURT:  Right next door.

14          Have you formed any impressions of our justice

15   system based upon your time as a juror?

16          PROSPECTIVE JUROR:  I believe the system works.

17   It's an important part of all our lives.  But I do believe it

18   works.

19          THE COURT:  You had an incident with your nephew

20   chasing someone who committed an assault.  I've got a similar

21   question for you about that.  Does that change your opinion

22   about the justice system in any way?

23          PROSPECTIVE JUROR:  No.  He was on a beach.  It was

24   on TV, IDTV, a show they did about it.  He saw a woman in

25   distress.  He knew something was wrong.  He took off after

1  her.  He helped the police, I guess he identified through the

2  object or whatever, and the fingerprints, or however they got

3  him.

4        THE COURT:  You had some kind of litigation

5  involving NYCTA involving work practices.

6        PROSPECTIVE JUROR:  Part of my career is I spent 31

7  years in New York City Transit.  When I was in the subway car

8  equipment department, part of my job was the safety protocols,

9  how to repair subway cars.  There was a requirement for hard

10  hat.  Some of the employees, for religious reasons, didn't

11  want to wear the hard hat.  We tried to accommodate everybody

12  as best we could.  We could not get around the hazards under

13  the subway car while doing the repairs.

14        THE COURT:  What is the substitute for a hard hat.

15        PROSPECTIVE JUROR:  The person involved was a Sihk,

16  and they felt that their turban would protect them.

17        THE COURT:  They felt the turban would protect them.

18        PROSPECTIVE JUROR:  The organization ultimately

19  decided that the risk to the co-workers and to themselves, we

20  couldn't put them in that scenario.

21        THE COURT:  That went to court?

22        PROSPECTIVE JUROR:  I recall it did.

23        THE COURT:  Were you a witness?

24        PROSPECTIVE JUROR:  No, I just did, I did the

25  deposition many years ago.

1      THE COURT:  You also had a traffic accident case

2  that you were involved in, your wife was hit in the back of

3  the car?

4      PROSPECTIVE JUROR:  Yes.

5      THE COURT:  That get resolved?

6      PROSPECTIVE JUROR:  It went to court.  The insurance

7  company represented the claim.  She was stopped.  The case, as

8  I recall, the person hit them from behind.  It was in front of

9  the police precinct in Nassau.  It was settled.  The insurance

10  company picked up the tab.

11      THE COURT:  I see you've made some responses to

12  either radio talk shows or written letters to the editor about

13  various topics.  One is the Mets and the outfield, we don't

14  need to say anything about that.

15      The other is the U.S. budget and the Presidential

16  election.  Tell me what you did with regard to the

17  Presidential election, what was your comment?

18      PROSPECTIVE JUROR:  My comment, if I could recall it

19  correctly was, is that there should be a better system in the

20  United States.  It seems crazy in this day and age that we're

21  doing things with paper ballets.  I would like everything to

22  be electronic.

23      The writing, maybe to Senator Schumer was about

24  pension costs, not taxing people living in Florida who are

25  retired out of New York.  I have concerns, like, how does he

1   equate with so many people leaving New York.

2           THE COURT:  Can they do that?  If you become a

3   Florida resident?

4           PROSPECTIVE JUROR:  If you're a state employee, you

5   don't pay the taxes.  At some point that may have made sense

6   financially, but looking at that I had concerns about that.

7           I don't really remember the radio.

8           THE COURT:  I think that's all I got.  Your wife

9   worked for Arab Bank?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  When was that?

12          PROSPECTIVE JUROR:  About 1993, '94.  The name was

13  The Arab Bank.

14          THE COURT:  I knew that.  I have cases involving The

15  Arab Bank.  Was she in Saudi Arabia?

16          PROSPECTIVE JUROR:  No, she was here in Manhattan.

17          THE COURT:  Did she form any impressions about her

18  bosses and how they treated her.

19          PROSPECTIVE JUROR:  I think she felt she got the job

20  because she's Mid Eastern.  She expressed a few times they

21  were less than progressive in the way they ran the bank.

22          THE COURT:  Less than progressive.  Okay.

23          That's all I've got.  Anything else?

24          MR. HARRIS:  No, your Honor.

25          MR. JACKSON:  No, your Honor.

PROCEEDINGS

1    THE COURT:  Wait for us right back there for a

2  minute.  We'll be in touch with you.

3    (Prospective juror exits.)

4    THE COURT:  I think we're there.  We have 39.

5    Let's talk for a minute before we break for lunch,

6  break for the day, about when we're going to open.  Let me

7  have the proposals.

8    MR. HARRIS:  Ready to open tomorrow.  I think there

9  is one issue as to when peremptories are done.  I can speak to

10  that, if you would like.

11    THE COURT:  I think we should do that today.

12    MR. HARRIS:  Your Honor, the Government -- I think

13  the defense has a different view -- the Government would like

14  to do peremptories tomorrow for two reasons.

15    First, if we do it today and bring folks back in and

16  somebody doesn't show, which happens, then we could be off to

17  a rough start.  I understand it's an inconvenience for some

18  the jurors, but I would like to make sure that when we start

19  tomorrow we have all the jurors we need.

20    Second, frankly, the Government would like to see a

21  full panel of people when making our strikes.  I think it's a

22  greater inconvenience if we get there and we don't have all

23  the jurors we need.

24    THE COURT:  What I was concerned about was that if

25  we couldn't bill them tomorrow, I didn't know if we could fit

PROCEEDINGS

1  everything in on Thursday for sure.  Now that we're going to

2  open tomorrow, we will fit everything in by Thursday.  So I

3  don't see any reason why we shouldn't exercise the

4  peremptories when we see who we get tomorrow.  Right?

5          MR. JACKSON:  Your Honor, I guess I'm having trouble

6  understanding what the concern is about people showing up

7  tomorrow.  Because people could not show up any day, we're

8  about to a multi-week trial.  If these people are coming in I

9  think we -- and someone doesn't show up, it's a different

10  question, but that can happen any day.

11          From our standpoint, if we wait until tomorrow to do

12  the peremptory strikes -- right now it's early, we could take

13  a couple of hours, come back to your Honor -- but if we wait

14  until tomorrow, instead of starting the morning fresh we're

15  starting the morning with a bunch of people who are

16  disgruntled to be brought in, they don't know what the

17  situation is, and we're inconveniencing a lot of people to be

18  able to look at them.  I don't think we can look at them any

19  more than we've looked at them here.  It seems better to get

20  it done this afternoon, know exactly who the jury is, then

21  start fresh tomorrow morning with opening with the Court's

22  preliminary instructions and opening statements.

23          THE COURT:  Here is why I disagree with you.  I

24  think there is a higher, indeed much higher, likelihood of

25  no-shows tomorrow than there will be in the regular course of

PROCEEDINGS

1  the trial.  They don't know if they are in the jury yet.  If

2  anything comes up, they may not get here.  I think it's better

3  to do it that way.  I don't think they will be less

4  disgruntled if we do it that way tomorrow morning, than if we

5  were to pick them tonight and they return tomorrow morning.

6          Let's do it that way.  I appreciate your view,

7  though.  It's close.

8          Okay, then, I think we have nothing else to do

9  today.

10         MR. HARRIS:  One other issue to raise.  In one of

11 the orders that your Honor entered, you talk about the parties

12 submitting final jury instructions on the third day of trial.

13         THE COURT:  Can you do that?

14         MR. HARRIS:  The question is, is the third day

15 starting yesterday or does the third -- does the clock start

16 running tomorrow?

17         THE COURT:  It starts when you agree.  I want it on

18 the early side.  If you wanted four days, I wouldn't have a

19 problem with that either.  It's a long enough trial.  But you

20 decide when you want.

21         MR. LOWELL:  Tomorrow is Wednesday, we would do this

22 on Friday or submit over the weekend?

23         THE COURT:  Whatever you agree to, is fine for me.

24         MR. HARRIS:  Technically the third day of trial is a

25 week from Wednesday.

Rivka Teich CSR RPR RMR FCRR
Official Court Reporter

PROCEEDINGS

1          THE COURT:  Wednesday next week is fine with me.

2          MR. HEEREN:  Can we I just put on the record, so

3    we're on the same page, the jurors are that are in the venire

4    so it's confirmed?

5          THE COURT:  That's a good idea.  Read that and my

6    law clerk will tell me if you're right.

7          MR. HEEREN:  5, 8, 11, 15, 28, 37, 41, 49, 53, 54,

8    57, 59, 78, 80, 82, 87, 89, 1O4, 111, 112, 114, 119, 129, 148,

9    157, 160, 170, 172, 175, 184, 186, 196, 202, 210, 214, 220,

10   221, 222, 223.

11         MR. JACKSON:  Those are the same we have.

12         THE LAW CLERK:  That's correct.

13         THE COURT:  Thank you all for your cooperation in

14   this process.  I think we did it as easily as can be done.  I

15   think it worked well.

16         (Whereupon, the proceedings concluded.)

17

18

19

20

21

22

23

24

25